IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 12-01076 (ESL) |
| NATIONAL PROMOTERS AND SERVICES INC. | CHAPTER 11 |
| Debtor | |
| NATIONAL PROMOTERS AND SERVICES, INC. | ADV. PROC. NO. 13-00049 (ESL) |
| Plaintiff | |
| vs. | FILED & ENTERED JUL/2/2020 |
| ASEGURADORA ANCON, S.A. | |
| Defendant | |

**OPINION AND ORDER**

This adversary proceeding is a breach of contract and collection of monies action that allegedly belong to the bankruptcy estate. The issue before the court hinges on the interpretation of clause four (4) of the "Acuerdo Privado de Compraventa de Acciones y Sobre Otros Extremos" (Private Purchase and Sale Agreement of Shares and Other Matters) executed between Plaintiff NATIONAL PROMOTERS AND SERVICES, INC. ("NAPRO") and Defendant ASEGURADORA ANCON, S.A. ("Ancon"). The agreement is Joint Exhibit 1. The Debtor contends that the contract clause (clause four) that provided the Defendant the right to retain the $3000,000 for actions of the corporation while the previous officers were in charge is not a valid clause against the Debtor pursuant to the doctrine established in Bangor Punta Operations, Inc. v. Bangor & A.R. Co., 417 U.S. 703 (1974). The Debtor/Plaintiff also argues that the Supreme Court of Puerto Rico in Multinational Life Insurance Company v. Carlos Benitez Rivera; Edgardo Van

-1-

Rhyn Soler, et als., 193 D.P.R. 67 (2015) stated that in Bangor Punta, a purchaser (Ancon) cannot claim from the seller of the shares (NAPRO) for alleged acts of bad administration that could have occurred prior to the purchase and sale of assets.

Both parties agree that the terms of the private agreement and its clauses are clear since the same were drafted and negotiated by sophisticated parties and that the $300,000.00 retained by Ancon from the original purchase price of the shares was to guarantee the obligations not reflected in the financial statements as of September 30, 2011. However, the parties disagree as to whether there were obligations that were not reflected in the financial statements as of September 30, 2011 within the nine (9) month period from the execution date of said agreement. The parties have focused on presenting to the court various financial statements of NALIC to evince their respective positions regarding the obligations and whether the same were reflected on NALIC's financial statements as of September 30, 2011.

For the reasons discussed below, the court holds that Plaintiff's argument that the fourth clause of the private agreement of sale of shares is not a valid clause because of the doctrine established in Bangor Punta Operations, Inc. v. Bangor & A.R. Co. is inapposite. The court also holds that the case of Multinational Life Insurance Company v. Carlos Benitez Rivera; Edgardo Van Rhyn Soler, et als., is based upon a different factual scenario, causes of action, and therefore different legal foundations that are not directly relevant to the instant adversary proceeding.

In addition, after due consideration of the evidence presented, the court finds that there were obligations that were not reflected in the financial statements as of September 30, 2011 and that the same exceeded the amount of $300,000 that was reserved to guarantee these obligations. The obligations that were not reflected in the financial statements became known to Ancon within the nine-month period after the execution of the private agreement.

The adversary proceeding came before the court for evidentiary hearings on October 10, 2018 November 8, 2018 and December 10, 2018.

### Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §§157(b)(1) and (b)(2). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

### Procedural Background

The Debtor filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on February 15, 2012. The deadline to file a proof of claim for all creditors was June 21, 2012. The Debtor included in its amended Schedule B- Personal Property, an account receivable from the purchase of shares of National life Insurance Company, that is now Multinational, in the amount of $300,000.

On March 14, 2013, the Debtor filed the instant adversary proceeding against Ancon for breach of contract and collection of monies pursuant to a Private Agreement of Sale of Shares and Other Matters executed between NAPRO, among others, and defendant Ancon. "As part of the sale price, Ancon was to deposit $300,000 in an escrow account, to be retained for nine (9) months to guarantee any obligations not reflected in NALIC's financial statements, as of September 30, 2011, caused to NALIC by officers and/or directors of NALIC, while Carlos M. Benitez Rivera was Chairman of the Board of said company. Pursuant to the agreement, after nine (9) months, any amount left in the account would be paid to NAPRO." After various extensions of time, the Defendant filed its *Answer to the Complaint* on November 1, 2013. On January 28, 2014, the pretrial conference was held. The court granted the parties sixty (60) days to file a settlement agreement and ninety (90) days to file dispositive motions and replies are due fourteen (14) days thereafter.

On May 5, 2014, the Debtor filed its *Third Amended Plan of Reorganization* and the *Order Confirming Third Amended Plan* was entered on May 23, 2014.

On May 7, 2014, NAPRO filed a *Motion in Compliance with Order to Inform* requesting that the court issue an Order to compel Ancon to answer the interrogatory and produce the documents requested. It also requested a date for a pretrial hearing, given that no settlements or agreements have been reached by the parties and thus, requested a date for a pretrial hearing (Docket No. 26). On May 7, 2014, Ancon filed its *Motion in Compliance* by which it requested that the discovery remain open for at least another month so that the parties may continue to exchange information that could potentially result in a settlement (Docket No. 27). On May 13, 2014, the Plaintiff requested that the court set a date for a pretrial hearing (Docket No. 28).

On June 26, 2014, the Debtor/Plaintiff filed a *Motion to Inform Intent to Perform Additional Discovery* requesting a term of forty-five (45) days to conclude discovery and file dispositive motions and the court granted the same on July 1, 2014 (Docket Nos. 34 & 35). On July 15, 2014, the Plaintiff filed a *Motion to Inform Service of Request for Discovery* (Docket No. 37). On September 11, 2014, the Plaintiff/Debtor filed a *Motion Requesting Order to Compel Response to Discovery Requested by the Debtor* requesting the court to order the Defendant to immediately respond to the discovery interrogatories submitted and served on July 15, 2014 and the same was granted on September 15, 2014 (Docket Nos. 38 & 39).

Plaintiff filed additional motions to compel and requested sanctions for violating discovery requests and orders. On November 2, 2017, the Court entered an Order in both adversary proceedings, 13-00049 and 13-00051, finding that the Defendants did incur in delayed compliance with the discovery requests, but that the same did not raise to the level of bad faith and, thus, the court awarded as sanctions in favor of NAPRO and against Ancon the amount of attorney's fees incurred as a result of their failure to comply with the discovery requests. The court declined to enter default as a sanction. In the same Order, the court granted the Plaintiff's request for a prejudgment attachment in both adversary proceedings after finding that such provisional and preventive measure to insure the effectiveness of a judgment on the merits under the particular circumstances of this case, involving delay due to discovery and involving transfers which may arguably place into question the ability to pay (Docket No. 114).

On November 2, 2017, the court entered an Order and Notice scheduling an evidentiary hearing on the merits of the complaint for February 28, 2018. The parties were ordered to file proposed findings of fact and conclusions of law fourteen (14) days prior to the hearing (Docket No. 115). Plaintiff filed its *Proposed Findings of Fact and Conclusions of Law* on February 19, 2018 (Docket No. 152). On February 19, 2018, the Defendant filed its *Statement of Facts and Memorandum of Law* (Docket No. 153).

On February 28, 2018, the evidentiary hearing commenced. The court stated that regarding adversary proceeding 13-00049, the same is centered on a specific clause in a sales agreement regarding an escrow account in the amount of $300,000 and whether these monies should be paid or not. The parties noticed when they were marking the evidence that there were two (2) different versions of the contract in controversy, particularly as to clause number four (4), which is the key clause. The court stated that it is critical to determine which of the contracts will be presented to the court because the standards of responsibility in clause four (4) regarding the creation of an escrow account are different in each contract. The court granted the parties thirty (30) days to inform the court on the status of verifying which contract will be presented. The court further stated that the evidentiary hearing was continued without a date because the contract is the key to the decision.

On April 23, 2018, Ancon filed a *Motion in Compliance with Defendant's Obligation to Inform the Court the Reason for the Existence of Two Different Agreements of the Shares Buy-Sell Agreement and About Other Matters* (Docket No. 163). On April 24, 2018, the Debtor/Plaintiff filed a *Motion Requesting Evidentiary Hearing and to Clarify the Record* informing the court that the matter regarding the correct copy of the Purchase Agreement was resolved by the parties and requested the court to schedule an evidentiary hearing (Docket No. 164).

On June 1, 2018, the court entered an Order and Notice scheduling an evidentiary hearing for October 10, 2018 to consider the motion in compliance with court order filed by Aseguradora Ancon S.A. (Docket No. 163) and the motion requesting evidentiary hearing filed by NAPRO

(Docket No. 164). The parties were ordered to file proposed findings of facts and conclusions of law by September 26, 2018. On June 29, 2018, NAPRO filed a *Motion to Ratify Agreement as to Controlling Documents* clarifying that there is no controversy between the parties as to which is the controlling contract between the parties. The Plaintiff explained that if there is a controversy it is as to the alleged intent of such document raised by Ancon and that there is no need to discuss the intent of the parties at this time (Docket No. 170).

On September 25, 2018, the Debtor/Plaintiff filed a *Motion in Limine to Exclude Evidence Not Previously Produced Through Discovery* (Docket No. 173). On September 25, 2018, the Debtor/Plaintiff filed a *Motion Requesting Summary Judgment* (Docket No. 174). On September 25, 2018, NAPRO filed its *Statement of Uncontested Facts in Support of Debtor's Motion Requesting Summary Judgment* (Docket No. 175). On September 28, 2018, the Defendant filed its *Amended Statement of Facts and Memorandum of Law* (Docket No. 178).

On October 9, 2018, Ancon filed its *Response to Statement of Uncontested Facts in Support of Debtor's Motion Requesting Summary Judgment* by which it requested that the court deny Debtor/Plaintiff statement of uncontroverted facts except for those statements that are expressly accepted by Ancon and declared as uncontroverted facts the facts brought by Ancon as uncontroverted (Docket Nos. 179 & 180). Also, on October 9, 2018, Ancon filed its *Opposition to Debtor's Motion Requesting Summary Judgment and Cross Motion for Summary Judgment* (Docket No. 181). On October 10, 2018, Ancon filed its *Opposition to the Motion in Limine* (Docket No. 182).

The court did not rule on the cross motions for summary judgment and opted to hold the evidentiary hearing as scheduled.

### Evidentiary Hearing(s)

On October 10, 2018, the evidentiary hearing was reinitiated. Attorney Carmen Conde and attorney Luisa Valle Castro appeared on behalf of NAPRO. Attorney Marcos Valls Sanchez appeared representing Aseguradora Ancon, S.A. Attorney Valls stated that his witnesses were Yadira Mercado, attorney Carlos Iguina and Mr. Tobias Carrero. Attorney Conde stated that the

witnesses that would be presented were Carlos Manuel Benitez Rivera and, if need be, Yadira Mercado and Mr. Tobias Carrero. Attorney Valls informed that he was stipulating all the questions and answers of Yelitza Cruz. **Exhibits 4 and 5**.

The court inquired if there were any preliminary matters that needed to be decided before commencing the presentation of the evidence. Mrs. Conde replied that what remains pending is the motion in limine and the response just filed today. Mr. Valls stated that there are motions for summary judgment that are pending resolution from this court. He indicated that the Plaintiff had filed a motion for summary judgment fifteen (15) days ago and the Defendant responded by opposing the same and by filing a cross motion for summary judgment. The parties argued on the timeliness of their respective motions for summary judgment.

The court stated that both the motion for summary judgment and the cross motion for summary judgment have relevant material facts in controversy. After due consideration of both motions, the supporting documentation and the allegations presented, the court found that there are material issues in fact in controversy that warrant this court to conduct an evidentiary hearing and decide the issue on the merits. The court denied the motions for summary judgment.

### **Plaintiff's Counsel's Opening Statement**

Plaintiff's counsel made an opening statement, which the court summarizes. The issue before the court is an agreement marked as **Joint Exhibit 1** signed on November 10, 2011. The parties to the same are NAPRO, the seller of the shares of NALIC. The purchaser was Ancon. National Promoters and Services, Inc. will be referred as NAPRO, National Life Insurance Inc. as NALIC, and National Insurance Company as NIC.

When NAPRO sold the shares to NALIC, Ancon was already the majority stockholder of NALIC. Therefore, after Ancon purchased the (NALIC) shares from NAPRO and the other entities, Ancon became the sole owner of all the NALIC shares. Ancon had previously purchased the NALIC shares from NIC. NIC was an entity that was liquidated by the Comisionado de Seguros (Office of the Insurance Commissioner). Ancon purchased the majority of the NALIC

shares from NIC when it was being liquidated and all the rest of the shares were purchased from NAPRO and from other entities which were minority shareholders.

The purchase price of the NALIC shares pursuant to the agreement was $2,566,000, of which NAPRO was to receive $2,504,307 (**Joint Exhibit 2**). Ancon retained $300,000 from NAPRO as the agreement provided that the $300,000 would be reserved for nine (9) months pursuant to paragraph four (4) (**Joint Exhibit 1**). The reserve was to guarantee obligations not reflected in the financial statement as of September 30, 2011. After the 9 months elapsed, the balance that was not consumed had to be returned to NAPRO. The interrogatories and the answer to the interrogatories show that the escrow account was never opened, and no notice was given to Debtor of obligations not reflected in the financial statements and paid within the nine-month period. Ancon did not make any payment to NAPRO. **Joint Exhibits 4 & 5**.

The contract provides in paragraph 14 that the same will be interpreted pursuant to the laws of the Commonwealth of Puerto Rico. In paragraph 16, the contract provides that all payments will be made without any deduction. Paragraph 16 is allegedly contrary to paragraph 4 because a deduction was made to NAPRO in the amount of $300,000. Paragraph 18 provides that if any clause is nullified by the court it will not impair the validity of the other clauses.

The bankruptcy petition was filed on February 15, 2012. The Debtor's schedules do not include any debt to Ancon, NALIC or Multinational (**Exhibit 1**). The claims register, **Exhibit 2,** does not show any claim filed by Ancon, NALIC or Multinational against NAPRO. Exhibit 3 is the Third Amended Plan of Reorganization which was confirmed by the court. The Third Amended Plan of Reorganization provides: "that proof of claims not filed will not be paid" and that "the means of execution for this plan will be in part from litigation proceeds" and pages 15 and 43 provide that claims not made are discharged. Therefore, there were no claims made in this bankruptcy petition from Ancon, NALIC, or Multinational.

The complaint was filed on March 14, 2013, to recover the escrow funds in the amount of $300,000.

**<u>Defendant's Attorney's Reply to Opening Statement</u>**

Attorney Valls replied that the financial statements performed by NALIC while Mr. Carlos Benitez was the President of the Board of Directors, including the last financial statement as of September 30, 2011, reported a capital surplus of $9 million. Ancon received the financial statements during the period prior to buying the shares in November 10, 2011. Two months later, the financial statements received by Ancon prior to purchasing the shares from NAPRO had to be adjusted to reality. The reality was that instead of there being a capital surplus of $9 million the company had a capital deficit in excess of $1 million. One of the reasons this occurred was due to the contractual relationship between NALIC and Option and the relation of their officers and stockholders, namely the Van Rhyn brothers.

Ancon did not file a proof of claim in the bankruptcy proceeding because Ancon did not have a claim against NAPRO. Ancon had an amount reserved to guarantee those obligations that were not known by Ancon pursuant to the financial statements they reviewed. There are no monies owed by NAPRO to Ancon.

The parties negotiated an amount to be reserved by Ancon in a bank account to guarantee the obligations not reflected in the financial statements. The reserve is a suspensive condition regulated by the Civil Code of Puerto Rico. Ancon retained from the price the amount of $300,000 to discount from that amount any obligation not reflected in the financial statements that appear within a nine (9) month term. Two months later, the $300,000 had been consumed. The evidence will show that the directors and officers of NALIC at the time caused that millions of dollars be claimed to Multinational life because Option had not paid the services provided. The entity that is ultimately responsible under the law for paying for the services was NALIC. NALIC paid because it had the obligation under the law to pay.

Defendant proffers that the evidence will show that they paid the providers around $1 million because Option did not comply with its obligations. There is no obligation under the contract to give notice of any claim to NAPRO. NAPRO gave authorization to Ancon to apply to the amounts reserved the obligations not known to them at the time of the signature. It is a self-

operating clause. If any amount of the $300,000 is left after discounting the obligations consumed, then the difference will be returned.  The evidence will show that Ancon paid the claims of the providers. The amounts not reflected in the financial statements that are applicable exceed the $300,000 by millions of dollars.

The financial statements reviewed by Ancon prior to acquiring the shares did reflect the underfunding of the pension plan. The issue in this case is what happened after the transaction. The amount that was reported in the September 30, 2011 financial statements was incorrect and that was the fault of the board of directors and officers of NALIC. The amounts not reflected in the September 30, 2011 exceed by much the amount reserved, and exceeded the amount reported in the financial statements.

**Plaintiff's witnesses:**

**Carlos Manuel Benitez Rivera**

Mr. Carlos Manuel Benitez Rivera testified that he is currently retired. He was the majority stockholder of NAPRO, which owned NALIC stock. On November 10, 2011, he entered into a buy and sell agreement with Ancon for the shares of NALIC. As of said date, the majority shareholder was Ancon because it had already purchased some of the assets of NIC, that was in liquidation by the Insurance Commissioner's Office. One of those assets was the NALIC stock owned by NIC. Ancon also purchased from NIC the Munoz Rivera building, an apartment in Coral Gables and some other assets. The purchase of the NALIC stock from NIC occurred prior to November 10, 2011. When Ancon purchased the shares of NALIC from NIC, the 2009 and 2010 financial statements were obtained from management. Mr. Benitez stated that there was no due diligence performed by Ancon as is usually the case with management. Ancon paid around $6 million for the majority of the NALIC shares and the rest of the assets such as the real property.

Mr. Benitez testified that when NAPRO sold the NALIC shares to Ancon there were no other financial statements available. He stated that it usually takes thirty to sixty days after the closing of the quarter for the financial statements to become available to the authorities.

He signed the contract (**Joint Exhibit 1,** Acuerdo Privado de Compraventa de Acciones) on behalf of NAPRO, Carlos M. Benitez, Inc. and Eagle Star Professional Services, Inc. and Mr. Tobias Carrero Nacar signed on behalf of Ancon. This is the document by which the NALIC shares were sold for $2,500,000 and that NAPRO received $2,200,000 million. The "obligaciones no reflejadas" in clause 4 are obligations not reflected in the financial statements. He explained that what he understands by this clause is that if there are financial transactions that are not reflected on the financial statements after the date when they closed the agreement, they could subtract from the $300,000. In his opinion, there were none that were not included in the financial statement.

The escrow funds did not guarantee any other obligations besides the obligations not reflected. He did not agree to guarantee other obligations of the 2009 and 2010 financial statements because they were not audited. His recollection is that the person in charge of the 2010 financial statements was Yadira Mercado, the senior vice president of finance, who signed the 2010 financial statement and the 2011 financial statement.

Mr. Benitez explained that at the time the shares were sold, NALIC's financial condition was good but deteriorating. NIC and NALIC were sister companies, so they had some cross ownership. At the end of 2009 or 2010, the Insurance Commissioner's Office ordered CPA José Mendoza to be the rehabilitator of NIC, which owned the shares of NALIC, which Mr. Tobias Carrero bought through Ancon from the Insurance Commissioner's Office. After NIC was intervened, the Order was expanded for the same rehabilitator, CPA José Mendoza, to also preserve the assets of NALIC. In the course of the rehabilitation and/or liquidation of NIC, NALIC was also supervised by the Insurance Commissioner's Office. During the normal course of business, when two parties are going to agree to buy and sell an insurance company, the buyer should first draft a letter of intent, then the seller will say yes or no. If the answer is yes, then the due diligence of both parties takes place in which both parties place their financial personnel to work out the numbers and then they come up with an agreement. In this specific case, Ancon's management was not involved in any negotiation. Management was not involved in the

-11-

negotiations of selling NIC's assets or in negotiating the amount that Ancon paid NAPRO for NALIC's shares because they were a minority stakeholder. In his opinion, it was basically a hostile takeover.

He stated that nine (9) months after the stock purchase of NALIC from NAPRO, they did not receive any monies from the $300,00 that were in the escrow account. He did not receive any notice after the nine (9) months had elapsed regarding the $300,000 nor any information as to any claims or obligations that were not reflected.

He was the chairman of the board of NIC and Edgardo Van Rhyn was the president of NIC at the time the Insurance Commissioner's Office took control of NIC and was liquidating NIC. At the time he was also the chairman of the board of NALIC and Edgardo Van Rhyn was the president of NALIC. While he was the chairman of NALIC he was aware of the commercial relationship between Option and NALIC, as well as the other directors of the board.

Mr. Benitez testified that he occupied the position of president of the board of directors from 2006-2011. He did not guarantee any other obligations because the financial statements were not audited. The reason for this is because NALIC was under the control of the rehabilitator José Mendoza and there were some issues between management and the Office of the Commissioner of Insurance. After financial statements are audited, there may be changes to the liabilities. The obligations guaranteed in clause 4 regarded a non-audited financial statement. He stated that the claims paid by a company during the year are included on the liability side of the financial statement because they are an obligation. It was stipulated that the $300,000 would be on an escrow account if there were nondisclosed items in the financial statements. A claim to be paid is a liability and part of the financial statements. A liability is an obligation.

Multinational Life filed suit against him in February 2012, within the nine (9) month period and they filed a counterclaim. Some of the allegations of the complaint are as to damages suffered by Multinational due to the contractual relation with Option, as Option was not paying the providers of the services of the health plan.

-12-

Mr. Benitez further stated that he does not agree with the proposition as to clause 4 that if the obligations not reflected in the financial statements as of September 30, 2011 because the obligations were reflected in the financial statements.

Option had a contractual relationship with NALIC. He was a stockholder, director and officer of Option. It was an arm's length transaction between a provider of a service, which was the MDA and Option. NALIC was given the name for the product. It was a relationship that started back in the year 2006 until Ancon bought the company.

### Yelitza Cruz Méndez

Her agreed to testimony are the interrogatories, admissions and documents marked as **Exhibit 4**. Plaintiff's counsel summarized for the record the questions and answers in the interrogatories.

### Argument by Plaintiff's Counsel

After the presentation of Plaintiff's evidence counsel argued as to what the evidence presented shows.

On November 21, 2014, Multinational Life Insurance Company and NAPRO signed an agreement by which Multinational made a non-refundable cash contribution to the pension plan in the amount of $2,600,000. The pension plan was disclosed, and the evidence shows that the underfunding of the pension plan was always disclosed. The amount paid by Ancon in the year 2014 was very close to the amount disclosed in the financial statements. Additionally, NALIC as of December 31, 2010 had a credit from Option Health Care Network in the amount of $1,900,000. Therefore, the underfunded pension benefit created a liability in the amount of $4,200,000. The agreement in no way guarantees a capital loss. The documents provided by Ms. Cruz show that NALIC was going through a distress and was downgraded by AM Best. NALIC was under the control of the Comisionado de Seguro.

**Defendant's witnesses:**

**Mr. Tobias Carrero Nacar**

Mr. Tobias Carrero Nacar has studies in business administration and insurance and has been in the insurance industry for more than forty years. Grupo Multinacional is the mother company of nine corporations in Panama, Curacao, Puerto Rico and Venezuela. Aseguradora Ancon is an insurance company established in Panama over 30 years ago. It is amongst the top premium insurance companies in Panama and one of the companies with the most capital and assets.

He has knowledge of the agreement to purchase NALIC shares from NAPRO which was signed by Ancon. Multinational's team is composed of insurance professionals in the areas of reinsurance, actuaries, financial experts, technicians in different branches of the insurance industry with experience in purchasing insurance companies. The team generally performs an analysis of what is occurring in the region of their companies. They made a first purchase of various assets in Puerto Rico in October 2011 based on the analysis performed by this group of specialists, and with information of international reinsurers such as MAPFRE Re, Swiss Re, Munich Re of the market in Puerto Rico. Swiss Re informed that NIC had financial troubles and through the Insurance Commissioner they had been assigned possible buyers. In August 2011, they started to analyze NIC, which held approximately 48% of the NALIC shares. An agreement, not to purchase the company (NIC), but rather certain assets and the insurance license was reached. As part of these assets, were 48% of NALIC shares. Thereafter, they contacted Mr. Carlos Benitez and reached an agreement to acquire the approximately 47% that he and his group held in NALIC.

Mr. Carrero was present during Mr. Carlos Benitez's testimony and heard him state that due diligence had not been performed. However, the group of professionals in charge of monitoring Latin America and Puerto Rico analyzed NIC's assets, which included approximately 48% of NALIC shares. Prior to entering into conversations with Mr. Carlos Benitez, the team made an analysis of NALIC in accordance to what was known in the market. Based on the

-14-

analysis, a proposal was submitted, and a purchase agreement of the shares was completed. They did perform an audit and statistical efforts with their internal team. Mr. Carrero clarified that when you perform an audit, it is based on the existing balances, and at that time the balances for the year 2009 had been approved and the year 2010 balances had been presented. Before signing the agreement on November 10, 2011, a preliminary report dated September 2011 was obtained through upper management. This report was used to execute the purchase agreement of 47% of the shares. He clarified that they also performed due diligence in the case of NALIC, but they did it with an external team without entering into the details with the executives of the company. A company's financial statements, especially in a company regulated by the state, in this case Puerto Rico, and governed by the insurance and reinsurance laws, and in which the Commissioner of Insurance's auditors inspect the company, are presumed correct and in conformity with the insurance and reinsurance laws of Puerto Rico.

It is customary in the insurance industry worldwide that when an insurance company is to be acquired, a stipulated amount of approximately between 10-20% is included as a retainage, so that after the purchase of the shares and the start of managing the company this amount can be used to compensate the buyer in the event that there are any type of liabilities not duly reflected in the financial statements. Liabilities may be reserves that are badly constituted or debts that are not duly reflected in the financial statements, and this is the reason why this amount is established. In this case it was an amount between 10-15% of an operation in the amount of $2,566,000. Thus, the amount of $300,000 was allocated. Attorney Carlos Iguina advised him regarding the private agreement. Clause four of the private agreement guarantees any subsequent liabilities not reflected on the financial statements or debts that the company has of various nature that are not reflected on the financial statements; such as badly constituted reserves in the areas of life insurance and health insurance, and mathematical reserves that are certified by international actuaries. If an actuary indicates that a mathematical reserve is badly constituted in conformity with the insurance law, it must be changed to include the correct figure. The insurers must reflect correctly the assets and liabilities of a company in the financial statements, in this case, as of

September 30, 2011. They subsequently detected that the financial statements were not correct in certain items, such as reserves in the event of a loss in some cases were not constituted and in other cases badly constituted below their value, such as a complaint filed in excess of $2,000,000 against NALIC by Mr. Gonzalez, an insurance intermediary, that had a relationship with NALIC. This liability was not duly constituted in the financial statement and subsequently a payment agreement was reached. Reserves from the health insurance portion that were marketed by Option were unduly constituted. Pursuant to the laws of Puerto Rico, the party that is ultimately responsible in the event of losses with the insureds was NALIC, and subsequently, Multinational Life Insurance Company. After November 10, 2011, there were many claims under this account, which reached the amount of approximately $10,000,000. During the nine (9) month period pursuant to clause 4 of the private agreement the amount surpassed $10,000,000.

After the purchase date he had an active relationship with the company's management and with the international actuaries. He cited the external auditors, Price Waterhouse, so they could clarify the balances of the year 2010 financial statements. The external auditors disclosed that the financial statements would undergo a significant change in the capital, namely a correction which would entail a capital reduction from a $9,000,000 capital surplus to a negative ($1,500,000) capital deficit. The negative change in capital, in addition to the claims that amounted to millions of dollars, was discovered 15 to 20 days after the purchase of the shares.

In a meeting with management and with the external auditors they became aware that to avoid a scandal in Puerto Rico with NALIC they had to increase the capital to preserve the workforce and assure the financial health of the company. Their insurers and intermediaries decided to inject capital in the amount of $15,000,000 on December 28, 2011.

Yadira Mercado is currently Multinational's vice president of administration and finance for both property and life insurance. He investigated the entire body of executives of the companies and decided to keep her in the company, initially as an adviser and later as vice president of administration and finance.

After conducting a thorough analysis of clause 4, Ancon determined that it did not need to establish a special account in the amount of $300,00, given the financial solvency Ancon had at the time and still has, including two accounts in two different financial institutions in Puerto Rico, with amounts much higher than the $300,000.

The consultants, as part of the due diligence, analyzed the August 26, 2011 news release regarding NALIC, and stated that when you are in a business, in this case insurance, if at the time NALIC would have had a AAA rating, then instead of paying the $2,500,000 that was paid to Mr. Benitez, they would have paid $200,000,000. He stated that they knew that NALIC had problems. However, there is a difference between having problems and having omitted or having lied in the financial statements. As of May 17, 2011, he did not know that NALIC was under the control of the Office of the Insurance Commissioner. They found out later. When they found out, they already had control of 47% of the shares, but not the majority of the shares. During their due diligence they had no knowledge of the Office of the Insurance Commissioner's Order to safeguard assets (orden para salvaguardar activos) against NALIC dated May 17, 2011.

There were liabilities which were not reflected in the financial statements, and that is why they had to make a capital increase on December 28, 2011. The financial statements of an insurance company are comprised of assets and liabilities. Within the liabilities of the financial statements, there is a reserve for losses ("reserva de siniestros"). There was a substantial amount of money that was not reflected accurately in the reserve for losses such as losses due to cancer, life, personal accidents. In addition, there are mathematical reserves and risks in course that are calculated by the actuaries, but these calculations depend on the information provided by management based on the operations of the company. The actuaries did not have the proper information. The actuaries had been lied to, and as a consequence, the financial statements had to be modified.  He does not have the documentation that evinces that the actuaries were lied to, just the fact that they had to do a $15,000,000 capital increase on December 28, 2011 to cover many of these deficiencies.

NALIC's 2010 financial statements, in the same manner as the 2009 financial statements, included a note as to the use of estimates in the preparation of financial statements that "actual results could differ from those estimates" (**Exhibit B, pg. 19, item B**). NALIC's 2010 financial statements, in the same manner as the 2009 financial statements also included a note that provided the status of the defined benefit plan disclosing that the plan is underfunded by $2,000,000 based on the review of the January 1, 2009 actuarial evaluation (**Exhibit B, pg. 19.3, item 12**). NALIC's 2010 financial statements, in the same manner as the 2009 financial statements, included a note as to contingencies that reads, "the Company is subject to legal proceedings and claims in the ordinary course of business that have not been finally adjudicated" (**Exhibit B, pg. 19.4-19.5, item 14**). NALIC's 2010 financial statements, in the same manner as the 2009 financial statements, included a note "Loss/Claim Adjustment Expenses. A. Accident and Health Unpaid Claims and Claim Adjustment Expenses: As indicated in Note 1 to the financial statements, changes in the ultimate liabilities for insured events may be required as information develops which varies from experience, provides additional data or, in some cases, augments data which previously were not considered sufficient for use in determining loss reserves." **(Exhibit B, pg. 19.6, item 34).** These are the financial statement that underwent a drastic change by the Price Waterhouse external auditors.

The actual results were very different from the estimates in NALIC's September 30, 2011 financial statements (**Exhibit C, pg. 7, item 1(B)**). Actual results may differ from the estimates, but not due to lies in the financial statements. The September 30, 2011 quarterly financial statements, item 1(C)(18) reads; "Pension cost- pension expense is provided on the basis of contributions made to the pension plan as determined by consulting actuaries" (**Exhibit C, pg. 7.2, item 1(C)(xviii)**). Item 12 discloses the condition of the pension fund as it so reads there (**Exhibit C, pg. 7.3, item 12**). In the quarterly financial statements of September 30, 2011, item 14 states that there are pending legal proceedings, but this does not justify falsifying financial statements.  (**Exhibit C, pg. 7.4, item 14**). The reserves may suffer minimum variations, and, in that case, there is a clause called incurred but not reported. In this case the variations were beyond

the law.  He stated that item 34 of the quarterly financial statements of September 30, 2011 reads that there may be adjustments to the reserves (**Exhibit C, pg. 7.6, item 34[1]).**

The 2009 financial statements disclosed an amount for aggregate reserves for life insurance in the amount of $87,000,000 and reserves for accident and health in the amount of $11,700,000. Claims for life in the amount of $5,200,000 and claims for accident and health in the amount of $11,500,000 (**Exhibit A**). The 2009 financial statement was amended to reflect that the aggregate reserves for life was increased from $87,600,000 to $92,000,000 and the aggregate reserves for accident and health did not suffer any change in the amendments (**Exhibit 12**).  The 2010 financial statements disclosed an amount for aggregate reserves for life in the amount of $88,500,000 and reserves for accident and health in the amount of $12,300,000. In the amended 2010 financial statement the aggregate reserves for life was in the same amount of $88,500,000 and the aggregate reserves for accident and health stayed in the same amount of $12,300,000. The claims for life in the amended financial statement was in the same amount of $4,800,000 and the claims for accident and health were in the same amount of $16,200,000 (**Exhibit 13**).

The amounts reflected in the September 30, 2011 financial statements for the December 31 prior year disclose the aggregate amounts for life, health, claims for life and claims for health as those amended in the 2010 financial statements (**Exhibit C and Exhibit 13**). Pursuant to the Price Waterhouse report there was a capital insufficiency in the amount of $20,000,000. The external auditors amended the balances.

There is a note that refers to some claims (**Exhibit C, pg. 19.15, item 14[2]**), and in the 2009 financial statements it indicates that the pension plan was underfunded in the amount of

---

[1] Item 34 in the September 30, 2011 states: "Loss/Claim Adjustment Expenses. A. Accident and Health Unpaid Claims and Claim Adjustment Expenses: "As indicated in Note 1 to the financial statements, changes in the ultimate liabilities for insured events may be required as information develops which varies from experience, provides additional data or, in some cases, augments data which previously were not considered sufficient for use in determining loss reserves" (**Exhibit C, pg. 7.6, item 34**).

[2] Item 14 of the Notes to NALIC's amended December 31, 2010 financial statements provides in pertinent part: "Contingencies: The company is subject to legal proceedings and claims in the ordinary course of business that has not been finally adjudicated. These actions, when finally concluded, will not, in the opinion of management and its legal counsel, have a material adverse effect upon the financial position or results of operations of the Company." (**Exhibit C, page. 19.15, item 14**).

-19-

$2,500,000. It is not in the profit and loss column. He did not know that the Pension Benefit Guarantee Corporation (PBGC) in the year 2013 audited the pension plan. In August 2013 he paid $2,600,000 to the PBGC for a liability regarding the pension plan. This is a liability that was not reflected in the profit and loss statement but as a note to the financial statement. There is an insufficiency according to the financial statements that were presented and amended in the year 2012 based upon a report by the external auditors due to different items of claims against the company for approximately $20,000,000. Consequently, as a shareholder, or as a new shareholder, they had to increase the capital by $15,000,000 to NALIC, now Multinational Life Insurance Company.

In the 2009 financial statements, the liabilities, surplus and other funds disclose a capital surplus in the amount of $20,236,184 (**Exhibit A, pg. 4, line 55**). The amended 2009 financial statements disclose a negative capital of ($1,628,910), which means that neither the reserves nor the contingencies were duly constituted within the corporation, and as a consequence Ancon had to make a $15,000,000 capital injection (**Exhibit 12, pg. 4 line 55**). In the 2010 financial statements, the liabilities, surplus and other funds disclose a capital surplus in the amount of $13,294,435 (**Exhibit B, pg. 4, line 55**). The amended 2010 financial statements disclose a negative capital of ($96,219), which means that the reserves were insufficient and that there were debts that were not provided for. There were insufficiencies in excess of $10,000,000 (**Exhibit 13, pg. 4, line 55**).  The financial statements for the quarter ended September 30, 2011, the liabilities, surplus and other funds disclose a capital surplus in the amount of $9,771,290, which was reported by prior management before buying the shares (**Exhibit C, pg. 4, line 55**).  The surplus capital reported in the prior year was $12,308,670. In the 2009 financial statements line 2599, total write-ins are in the amount of $1,966,055 (**Exhibit A, pg. 3, line 2599**). The amended 2009 financial statements show total write-ins in the amount of $8,161,861 (**Exhibit 12, pg. 3, line 2599**). This amount is much more than the amount of the $300,000 retainage in clause 4.

In the 2010 financial statements the underfunding of the plan was approximately $2,000,000 (Exhibit B, pg. 19.4, item 12). Multinational Life paid $2,648,277 to purchase the

assets. The difference between what was reported and what Multinational Life paid is approximately \$600,000. Twice the amount of \$300,000 (Exhibit 14).

### **Yadira Mercado Piñeiro**

Yadira Mercado Piñeiro is the senior vice president of finance of operations and administrations of Multinational since May 2012. She has a bachelor's in business administration from the University of Puerto Rico, Mayaguez campus with a double major in accounting and finance. In November 2010 she started working with NIC and NALIC as senior vice president of finance for both companies. She has more than thirty (30) years of experience, mostly supervising the areas of accounting, finance and treasury of the institutions. She has been in charge of those departments and responsible for the preparation of the financial statements and serving as liaison between the regulatory agencies and the companies.

The original 2009 annual statements (**Exhibit A**) were filed before she started working for the corporation. The original 2009 annual statements, together with the audited financial statements, had to be amended because there were material errors with the original annual statements that had been initially filed and because there were several material adjustments that were not incorporated in the 2009 and 2010 original annual statements filed.

The Office of the Insurance Commissioner has full authority to audit the insurance companies. Shortly after she started in November 2010, the Office of the Insurance Commissioner of Puerto Rico issued a report on an audit that they had performed for the year 2009. As a result of that audit, several information that was included in the 2009 and 2010 annual statements was required to be adjusted and corrected. Her department started working with the report of examination to ascertain that the adjustments that they were proposing were in fact needed and that the financial statements needed to be corrected. At first those findings were objected by the company, but the Office of the Insurance Commissioner reaffirmed that those adjustments had to be posted.

The statutory financial statements are the financial statements that insurance companies prepare in accordance with statutory statements and accounting principles, and which are

sometimes different to generally accepted accounting principles. The statutory financials are more conservative. The annual statement is prepared by management and the audited financial statements are the financial statements prepared by management but audited by a certified public accounting firm. The auditor for the 2010 financial statements was Price Waterhouse. They had to include a 2009 financial restatement because of material adjustments found by the auditors and some related to what the report of examination of the Office of the Insurance Commissioner had recommended. They also had to be restated for the year 2010. The financial statements are comparative and include two (2) years. The 2010 audited financial statements include a restatement of the 2009 financial statements previously issued. The participation that her department had in the preparation of the audited financial statements include providing all the information related to the financial statements. They also provide all the financial schedules and financial work papers needed by the auditors in order to issue an opinion on the financials and decide whether the financials will have adjustments or are going to remain the way management provided the financial statements.

The findings and conclusions of the audited financials are in a report titled, audited statutory financial statements. This document, dated January 20, 2012, is the statutory financial statements and supplementary investment schedule (**Exhibit D**). This financial statement was addressed to the Board of Directors but delivered to her so that she could present it to the board for discussion. This document is required to be filed at the Office of the Insurance Commissioner of Puerto Rico and also with the NAIC (National Association of Insurance Commissioners of the United States). It is also provided to A.M. Best, which is the rating agency for the insurance companies in the United States.

Both reports are based on statutory accounting principles dictated by the National Association of Insurance Commissioner. However, there are some permitted practices that, if requested to the Office of the Insurance Commissioner of Puerto Rico and approved, are incorporated into the annual statements prepared by management. In the opinion the auditors clarify that these financial statements contain differences between statutory accounting practices

and practices permitted by the Office of the Commissioner, but they are included in both statements. The differences between the NAIC practices and the Office of the Insurance Commissioner's practices are disclosed in both statements. The audited financial statements and the statutory annual statement are both prepared by management. The PwC statements are audited and examined by the external auditors. The financials pertain to management and are provided by management as well.

The restated financial statements (**Exhibit D**) are the 2009 financial statements that were previously examined and had to be amended to include adjustments considered material by the external auditors in order to restate the financials. The changes that occurred and caused that the 2009 statements be restated are disclosed on page 11 of the document referring to restatement of previously issued financial statements and correction of an error. The eleven bullet points after the title are the errors that were found in the previously issued financials. The company determined it was necessary to restate its statutory financial statements for the year ended December 31, 2009 due to the errors listed under the bullets. On page 12 there is a column of adjustments and then there is a final column that includes how the financial statements looked.

Some of the eleven bullets are related to errors in the liabilities of the company which are discussed herein. The third bullet states that an adjustment was required to correct an error in the aggregate reserves of life and annuity multi-term policies from Florida from 2006 to 2009 in the amount of $4,414,538. The third bullet refers to an obligation in the aggregate reserves. The auditors found a $4,400,000 adjustment required to increase the reserves that appear on the 2009 financial statements previously issued. The same increased from $87,652,446 to $92,066,984, and are disclosed on page 12 where it states, statement of admitted assets, liabilities, capital and surplus (statutory basis). This adjustment was necessary because the reserves for 2009 were inadequate as a result of the actuarial analysis that the auditors performed. Management had the obligation to maintain adequate reserves within the company.

The fourth bullet states that the 2009 financial statements did not reflect a contingent liability for a legal claim against the company. In 2009 the company entered into a settlement for

a legal claim in the amount of approximately $2,540,000 and it was not recorded as a liability in the previously issued 2009 financial statements. Management had the responsibility to include this liability and that is why the financials had to be restated. In addition, the fifth bullet states that the 2009 financial statements did not reflect the accounting for the Company's pension plan in accordance with SSAP No. 89- Accounting for Pensions.

The eighth bullet is an error in the liabilities requiring an adjustment to correct accounts payable with a debit balance. It was an account payable that had a debit balance in the financials in the range of $100,000- $200,000 and had to be reclassed against accrued liabilities. This was a small adjustment when compared to the others. Bullet number nine is an adjustment that was required to record accrual for excess claims paid by the claim administrator of the assumed reinsurance over withheld funds. This adjustment is included in the second line item, accounts payable and other liabilities that increased from $2,482,410 to $9,374,113 as a result of an adjustment of $6,891,703 is comprised of the $2,500,000 for the legal settlement not included as an obligation and also a $4,000,000 adjustment to the pension plan to record the unfunded liability of the pension plan that was not previously recorded by mistake. It was management's obligation to include those liabilities in the annual statements.

The table on page 27 is the reconciliation between the numbers filed in the annual statements for the year 2010 and the adjustments made to those financial statements, which required that the 2010 annual statements be amended (**Exhibit D, pg. 27**). The second column provides how the liabilities were reported originally in the annual statement. The liabilities originally reported in the 2010 annual statements were in the amount of $130,450,590 and required adjustments to increase the liabilities to $135,578,978. The adjustments are listed on the second column of this table. The second table on page 27, titled statement of admitted assets, liabilities, capital and surplus, discloses that the total liabilities pursuant to the audited financial statements were in the amount of $135,232,885 and the total liabilities in the 2010 annual statement were in the amount of $125,072,278 which resulted in a $10,160,607 difference. This is the difference between the 2009 annual statement filed and the restated 2009 audited financial

statements that were filed. On page 27 of this document is a reconciliation of the 2010 annual statement that was filed, and all of the adjustments needed to amend the 2010 annual statements. Once they received the audited report, the company had to amend the 2009 and 2010 annual statement.

Ms. Mercado testified that Exhibit D includes the audited financial statements for 2010 and it shows the results of 2010 as final, but this is the report prepared by NAPRO and issued by the auditors. The 2010 annual statement was already filed because this report is due in June and the annual statement is due in March. This report contains a reconciliation between what was filed in the 2010 annual statement and what the auditors adjusted. She explained that regarding 2009, the auditors had already issued a 2009 audited financial statement, but they had to restate it because during the audit of 2010 the auditors found out that the 2009 previously issued audited financial statement needed to be restated. Thus, they had to restate the 2009 audited financial statements and the 2009 annual statement as well.

The original 2009 annual statement included in line 1 aggregate reserves in the amount of $87,662,446 (**Exhibit A, pg. 3, line 1**) and the amended 2009 annual statement included the $4,400,000 adjustment, and included for line 1 aggregate reserves in the amount of $92,066,984 (**Exhibit 12, pg. 3, line 1**). The amount in the original 2009 aggregate write-ins for liabilities was in the amount of $1,966,055 (**Exhibit A, pg. 3, line 25)** and in the amended 2009 the aggregate write-ins was in the amount of $8,161,881 (**Exhibit 12, pg. 3, line 25**). The differences in those two amounts were because the other accounts payable increased from $58,630 to $2,598,623 as a result of the $2,500,000 adjustment made to record the obligation for the legal settlement. The amended 2009 annual statement discloses in line 2598 summary of remaining write-ins the amount of $3,655,810, which is a result of the pension plan minimum liability underfunding adjustment which was not accounted for originally. The original 2009 annual statement discloses an amount of $0. Page 53 of the amended 2009 annual statements is the overflow of write-ins which is the additional liability pension cost of $3,532,791 resulting from the adjustment (**Exhibit 12, pg. 53**). In the original 2009 annual statement filed there was no adjustment included. This

-25-

adjustment was first included when the 2009 annual statements were amended, just a couple of days after 2010. The 2010 numbers were needed in order to file the audited financial statements. The audited financial statements for 2010 were also filed in January 2012 and that was the first time that adjustment was recorded and reflected in the financials.

The original 2010 annual statement included aggregate reserves in the amount of $88,534,834 (**Exhibit B, pg. 3, line 1)** and the amended 2010 annual statement discloses the same amount of $88,534,834 (**Exhibit 13, pg. 3, line 1**) because that is the correct number. The adjustment was for the year 2009. The original 2010 aggregate write-ins for liabilities was in the amount of $1,990,869 (**Exhibit B, pg. 3, line 25)** and in the amended 2010 the aggregate write-ins were in the amount of $6,870,079 (**Exhibit 13, pg. 3, line 25**). The difference in those two amounts was mainly due to the pension plan adjustment in the amount of $4,200,000, which was not reflected in the original 2010 statement, and also there was still $1,000,000 from the legal settlement which had not been included as a liability.

Ms. Mercado explained that an underfunding of a pension plan occurs when the value of the assets of the plan is less than the vested benefits of the plan. The purpose of the notes of the financial statements is to expand upon information included in the financial statements. It gives a detail of the basic accounting policies and expanded detail of what is included in the financial statements. Note 12 discloses that using the December 31, 2007 latest actuarial valuation date, the vested benefits were in the amount of $11,831,243 and the plan's assets were in the amount of $9,282,318. (**Exhibit A, pg. 19. 3, note 12**). The underfunding of the plan disclosed in note 12 was not reflected in the liabilities, surplus and other funds portion of the financial statements. It was a mistake, and that it is one of the reasons the financial statements had to be amended. The disclosure was incorrect and had to be amended as well. She further stated that these annual statements had to be amended because the actuarial report that was used in the original annual statement for 2009 was old as it was an actuarial report of December 31, 2007, for financial statements ended December 31, 2009 (**Exhibit 12, pg. 19.11-19.12, note 12**). In her opinion, this is not a good practice. As part of the process of the amendments and correction of the errors it

was decided to ask for an updated actuarial valuation which included updated valuations for the years 2009 and 2010. As a result of the actuarial valuation, the underfunding status of the plan as of 2009 was in the amount of $3,934,786 compared to the $2,500,000 underfunding that was mentioned. For the year 2010, the underfunding status of the plan was in the amount of $4,251,769.

Ms. Mercado testified that for the quarter ended September 30, 2011, the financial statement did not include in the section of the details write-in liabilities any amounts pertaining to the underfunding of the pension plan (**Exhibit C, pg. 3**, **details of write-ins**). When this report was prepared, they were in the process of working with the adjustments for 2009 and 2010. Most of the numbers included in the 2011 report did not include adjustments and this was one of them.

She stated that in the original 2009 annual statement, note 34, which is titled loss/claim adjustment expenses regards the accident and health unpaid claims and adjustment expenses, indicates that there could be changes in the ultimate liabilities for insured events may be required as information develops which varies from experience, additional data or, in some cases, augments data which previously were not considered sufficient for use in determining loss reserves (**Exhibit A, pg. 19.6, note 34**).

In the original 2009 annual statement the aggregate reserves for accident and health contracts were in the amount of $11,762,081 (**Exhibit A, pg. 3, line item 2**). These are the reserves related to the accident and health lines of business. She stated that pertaining the health business, there was a contract with a TPA (third party administrator of a health insurance plan) called Option, in order for the TPA to manage a health insurance plan that was licensed by NALIC. NALIC had a health insurance plan for employees of different government agencies and some municipalities. Ms. Mercado explained that the claims were addressed to Option Healthcare Network, Inc. (TPA) at the end of each month, the TPA provided a detail of the pending claims to NALIC for NALIC to account for those pending claims in the financials. They used the report and based on the claims that were included in the report used the total of those claims that were pending to be paid were recorded in the financials. On page 3, line 2, is the aggregate reserves for

accident and health contracts for the year 2010. There are reserves for other lines included such as short-term and long-term disability offered by NALIC (**Exhibit B, pg. 3, line 2**).

The ICOS (in course of settlement) are those reserves for claims filed by the insureds or providers and pending to be paid and that is why they are called in course of settlement. On September 30, 2011, the amount for the reserves pertaining to ICOS was around $3,000,000. After November 2011, she received information regarding claims made to Multinational for the health contract with Option that were not included in the ICOS. There was a problem with Option because they were not sending to NALIC timely reports with the information on pending claims, or claims paid. The new administration started to make an internal audit to acquire more information. Many providers acknowledged that there was a new administration at NALIC, so they started to send the claims to NALIC. It was found that many claims which were included in the reports provided by Option were for amounts materially lower than the actual claims made by the providers. They received claims for more than $10,000,000 as compared to approximately $3,000,000 in claims that were included in the reports that had been previously provided to NALIC. The company had to start negotiating the claims with the providers to collect the premiums that appeared as pending to be collected. Between November 10, 2011 and October 9, 2012 there were many claims that were not included in the ICOS.

The reason the reserves were not sufficient for the claims that were received afterward was that the reports Option was sending were not accurate. Management's participation regarding the reports prepared by Option consisted in compiling the reports in order to generate the journal entries. Sometimes the reports were incomplete or different from the previous ones provided. Ms. Mercado informed the discrepancies to Mr. Edgardo Van Rhyn, who was the president of NALIC. Ms. Mercado testified that they were supposed to have the right to audit Option based on what the contract provided. But, while she was there, no audit was performed. When the new administration came, and due to the situation with all of the providers and the claims, and the incorrect receivables provided, a request of an audit of the company was made. Edgardo Van

Rhyn was the president of NALIC and a shareholder of Option. Pedro Van Rhyn was the President of Option. Edgardo Van Rhyn and Pedro Van Rhyn are brothers.

The uncollected premiums from the health insurance plan details were provided by Option to NALIC in order to account in NALIC's financials for the uncollected premiums. The company had more than $8,000,000 in uncollected premium receivables as reflected on the financial information provided by Option. After Option ceased its operations and NALIC started collecting the monies, it was found out that the reports that they were providing under the detail of receivables pending to be collected were overstated. The company started collecting from the municipalities and the different agencies what was included in the reports that were submitted. Finally, it was found out that the receivables included in the report were overstated and the company had to write-off those receivables because they were not going to be collected because it appeared that some of them were previously collected by the third-party administrator and the information that was being sent to NALIC was not correct.

Option, as part of the administration agreement, was supposed to receive 95% of the premiums for them to pay claims and administrative expenses of the plan and the remaining 5% was supposed to be given to NALIC as a fee for that business. Option started to collect, especially from the municipalities, the 100% of the premiums and the 5% that was supposed to be paid to NALIC was not paid in some instances. This created receivables which are the $2,500,000 write-off of non-admitted receivables. She clarified that when she started to work in November 2010, NIC, the property and casualty company, was already under the Order of the Insurance Commissioner to safeguard its assets. NIC had problems and that is why they were intervened by the Office of the Insurance Commissioner and at some point NALIC loaned $3,500,000 to NIC to pay reinsurance and those monies were not paid back by NIC and, thus, had to be written-off. The $1,300,000 write-off of uncollected reinsurance recoverable was due to the company having reinsurance recoverable on its books that was found to be incorrectly computed and accounted for, and as a result could not be collected from the reinsurers and had to be written-off as well. (**Exhibit 4, pgs. 6-7**).

The capital reflected on the original 2009 annual statement was in the amount of $20,236,184. On the amended 2009 annual statement, there is a capital deficit in the amount of ($1,628,910) (**Exhibit 12, pg. 4, line 55**). The difference was caused by the adjustments reflected in the audited financials. The capital surplus reflected on the original 2010 annual statement was in the amount of $13,294,435 (**Exhibit B, pg. 4, line 55).** On the amended 2009 annual statement, there is a capital deficit in the amount of ($96, 219) (**Exhibit 13, pg. 4, line 55**). The difference was caused by the adjustments that had to be accounted for because of the corrections of the errors. The capital surplus reflected in the quarterly September 30, 2011 annual statement was in the amount of $9,771,290 (**Exhibit C, pg. 4, line 55**). There is a minimum capital insurance requirement because of the Puerto Rico Insurance Code and if there is a need for capital based on the capital requirement or if a company has a negative capital, then additional capital needs to be infused into the company or the Commissioner of Insurance will take control of the company if the capital is not provided. On the original 2010 annual statement, note 13, paragraph B disclosed that, "under applicable Puerto Rico insurance laws and regulations, the Company is required to maintain minimum capital of $2,500,000. The minimum capital was amended in December 31, 2004 and allows the company a 5-year period to capitalize the company in order to comply with the regulation" (**Exhibit B, pg. 19.4, note 13(B)**). For the amended 2009 and 2010 there was a negative capital. This means that for the minimum capital required, the Insurance Commissioner has the authority to provide a five-year period to capitalize the company as the company has to be capitalized.

Ms. Mercado testified that she signed both annual statements and that both administrations relied on her representations on these documents (**Exhibit B and Exhibit 13**). The 2010 annual statement she signed was dated March 1, 2011 and the amended 2010 annual statement was dated January 20, 2012. This annual statement was the last financial statements available prior to the signature of the purchase agreement. The net admitted assets pursuant to the 2010 annual statement were in the amount of $142,000,000 and in the amended 2010 annual statement the net admitted assets were in the amount of $135,000,000. The assets were reduced because the

common stock was reduced by $6,000,000 as part of the adjustment. The real property, as compared from 2010 original with the amended 2010, was not reduced by $3,000,000. In the original 2010 and amended 2010 annual statement the real property was disclosed in the amount of $12,600,000, and for the year 2009 in the amended financial statements the value of the real property was reduced by approximately $3,000,000. All of the adjustments for these statements are specifically disclosed in the PwC financial statement which is Exhibit D.

Ms. Mercado stated that after amending the 2010 annual statement on January 20, 2012, she amended the 2009 annual statement on January 23, 2012. She did not sign the original 2009, but she did sign the amended 2009. The assets in the original 2009 annual statement were in the amount of $145,000,000 and the amended 2009 annual statements disclosed net admitted assets in the amount of $133,000,000 (**Exhibit A and Exhibit 12**). The reduction in net admitted assets was a decrease of approximately $12,000,000 and the amendments were made after the purchase took place. In the amended 2009 annual statement, she wrote-off $6,000,000 in common stock and deducted the value of the real estate by approximately $3,000,000. The first column under the assets of the original 2009 annual statements disclose $2,300,000 for receivables from parent, subsidiaries and affiliates and the same column in the amended 2009 annual statements does not have a value. There was a write-off in assets from the original 2009 annual statement and the amended annual statements. Liabilities increased by $10,000,000 from the original 2009 annual statement and the 2009 amended annual statement. One of the items in these amendments was due to contingencies, that is, legal claims not included. In the notes section to the original 2009 annual statement there is a general disclosure that there are contingencies, but it did not impact the annual statements. The original 2010 annual statement has the same note 14 regarding contingencies. This particular contingency was resolved by the court in the year 2009. There was a legal settlement signed in 2009, but she did not include it because she did not know about it.

There was an adjustment of $3,600,000 to the pension plan in the amended 2009 annual statement. In the original 2009 and 2010 annual statements a disclosure of the pension plan liability was included for incorrect amounts. In the original 2009 annual statement, the disclosure

on pg. 19.3 shows that there would be a liability of approximately $2,000,000, not the $3,600,000 that she finally concluded. This disclosure was incorrect (**Exhibit A, pg. 19.3, note 12**). In the original 2010 annual statement, the disclosure on page 19.3 disclosed that there would be a liability of approximately $2,000,000 (**Exhibit B, pg. 19.3, note 12**).

NALIC was a member of the Carlos M. Benitez, Inc. Employee's Pension Plan. The actuarial valuation report is supposed to include the pension plan as a whole. An independent certified public accounting report on a pension plan is a document that is customary in the pension plan's review and assessment. The actuarial valuation report of a pension plan is a document in the ordinary course of business of benefit plans. The net assets available for benefits as of December 31, 2010 was $10,900,000 and $10,100,000 for the year 2009 (**Exhibit 16-A, pg. 2**). The vested benefits for the year 2010 was $12,300,000 million and $12,100,000 for the year 2009 (**Exhibit 16-A, pg. 4**). These are not the same figures as the ones disclosed in the original 2009 and 2010 annual statements but are similar to what was included in the notes. However, they were not recorded in the financial statements. The actuarial valuation report discloses $12,300,000 as the present value of accumulated benefits as of January 1, 2011 and $12,107,975 as the present value of accumulated benefits as of January 1, 2010. The actuarial valuation report discloses $10,900,000 as the market value of assets with receivable contributions as of January 1, 2011 and $10,100,000 million for plan assets as of January 1, 2010 (**Exhibit 16-B, pg. 3**). The pension plan financial statements and the actuarial valuation report do not disclose a $3,600,000 difference which was the result for the 2010 amended annual statement because they were not recorded in the financial statements.

The aggregate reserves in the original 2010 and the amended 2010 are the same for life and health insurance (**Exhibit B, pg. 3 & Exhibit 13, pg. 3**). The original 2010 annual statement was the last financial statement prior to the closing. There was a $4,400,000 adjustment, but it was backdated. The difference in the aggregate reserve for life in the original 2009 ($87,600,000) and the amended 2009 ($92,100,000) annual statement is approximately $5,000,000 (**Exhibit A, pg. 3 & Exhibit 12, pg. 3**), that is a more or less a 5% variation. The aggregate reserves for

accident and health are identical in the 2009 original and 2009 amended annual statement (**Exhibit A, pg. 3 & Exhibit 12, pg. 3).**  She does not agree that the contingencies on legal claims of the pension plan were fully disclosed, included and reflected in the original 2009, 2010 and the September 30, 2011 quarterly statement.

She was not aware whether the relation between the president of Option and the president of NALIC was disclosed to the Office of the Insurance Commissioner.  She became aware of the purchase agreement between NAPRO and Ancon after it was signed. There was an agreement prior to her arrival between Option and NALIC. Prior to November 10, 2011 there was a lot of difficulty under this agreement to obtain timely financial reports from Option. Option was supposed to send them on a monthly basis financial information regarding premiums written, premiums receivables, premiums collected by them, claims. This information was not received on a timely basis on every month it was supposed to happen.

The original 2009, 2010 and the September 30, 2011 quarterly statements were filed before November 10, 2011, which is the date of the agreement. The September 30, 2011 quarterly statement was filed on November 10, 2011 (**Exhibits A, B, & C**). The amended 2009 and 2010 annual statements and statutory basis financial statements audited by PwC were filed after the purchase agreement.   The contingent liability was not included in the original financial statements, meaning that it was not recognized as a liability in the 2009 original financial statements filed. An adjustment was posted to recognize the $2,500,000 contingent liability in order to restate the previous financials. The reason for the restatement was that the adjustments were not included even though some were disclosed (**Exhibit D, pgs. 11-12**). Page 27 of the audit report discloses the differences between the 2010 annual statement originally filed and the final audited financial statements. The $1,000,000 adjustment for legal settlement out of the $2,500,000 was still not included in the original 2010 annual statement filed (**Exhibit D, pg. 27**).

The difference between the $11,800,000 in vested benefits and the $9,200,000 in plan assets that is disclosed in note 12 of the original 2009 annual statement was not recognized in the annual statement, and that is one of the reasons as to why they had to be restated (**Exhibit A, pg.**

**19.3, note 12**). She explained that in the original 2009 annual statement the real estate was in the amount of $11,000,000 and in the amended 2009 annual statement the real estate was in the amount of $8,000,000 because in the original a permitted practice in order to increase the value of real estate was accounted for but the company did not obtain permission from the Office of the Insurance Commissioner on a timely basis. Thus, the Office of the Insurance Commissioner requested to amend that annual statement to deduct that amount as it was not granted for the year 2009.

The aggregate reserves were adjusted in the amount of $4,400,000 and backdated to 2008. That is why the 2009 and 2010 aggregate reserves disclose the same amounts because that adjustment was backdated to the unassigned surplus of 2008. She explained that the variation of $4,000,000 in the life aggregate reserves was material because it had to be recorded in the financial statements. The external auditors established parameters to establish materiality based on the size of the company, the capital of the company, and the assets on the company. Based on these parameters, adjustments were recorded or were not recorded.

Ms. Mercado testified that she had mentioned to the President of the company, Mr. Van Rhyn, the situation regarding the timeliness of the financial information and he said that he was going to discuss it with the President of Option, who was his brother. She stated that they met two times, but the problems continued. The information was never received on a timely basis. Ms. Mercado explained that the importance of timely financial information is that in order to file adequate financials the premiums written, the premiums receivables, the claims paid, the claims pending to be paid information was necessary and it came from Option.

The legal claims contingency was never included in the Price Waterhouse original statements. The 2009 original annual statement stated that the contingency was not material. Ms. Mercado testified that a $3,000,000 adjustment in the legal contingencies is a material impact because of its impact on capital and capital has to be taken into consideration as well. This was material for the auditors. A settlement was reached in 2009.

**Carlos Rafael Iguina O'harriz**

Mr. Iguina is currently the president of Multinational Life Insurance Company.  He was involved in the negotiations and the drafting of the purchase agreement documents (**Joint Exhibit 1**).  He stated that various situations developed, and which are pertinent to the $300,000 retainage clause. They bought the company on November 1, 2011 and the contract was signed on November 10, 2011. After they bought the company and subscribed the contract issues began to happen with Option. Option was contracted by NALIC to be the third-party administrator of a health plan for government employees. A resolution from the Office of the Commissioner of Insurance of Puerto Rico was received, which indicated that there were serious conflicts of interests between the former president of NALIC, Mr. Edgardo Van Rhyn, and Option, due to the fact that the majority owner of Option was Mr. Van Rhyn, that his wife was working there, and that his brother, Mr. Pedro Van Rhyn was the president of Option. The resolution further indicates that the Option contract delegates insurance responsibilities that are only of the insurance company and are not allowed by the Office of the Insurance Commissioner. The Office of the Insurance Commissioner gave them 20 days to try to obtain another agreement with Option and, if not, the Office of the Insurance Commissioner would cancel the contract. Under the resolution the license of NALIC could be in jeopardy. They immediately hired personnel to audit the third-party administrator. However, they were not allowed to do the audit by the Van Rhyn brothers and other individuals that worked for Option. They found out that the vice president of operations of NALIC was also a consultant for Option. Under those situations, the conflicted officers left the company.

In January 2012 they received the opinion of the independent auditors indicating that there were transactions not reported and which were obligations of NALIC. These transactions were not in the financial documents that they revised and evaluated to make the offer to buy the stock.

He recalls that there were problems with the reserves regarding the life products. There were also problems with a contingency in a case for over a million dollars regarding an insurance agency (J.A. Gonzalez), which was not included in the financial statements. There were also problems with the pension plan that was underfunded. There were serious problems with capital.

The last statement they received was the quarterly statement as of September 30, 2011, which indicated that the capital of the company was around $8,000,000. But, after they included all the unreported obligations, the capital of the company was less than the minimum required by the Insurance Code, which is $2,500,000. Therefore, the new owners had to capitalize the difference. All of the claims that he is referring to exceed the $300,000 in clause four of the purchase agreement.

Once they received the claims pertaining to Option, they hired two doctors to deal with this issue and deployed 3 or 4 employees to be completely involved with the situation along with the attorneys. As an example, they received a claim from the U. S. Attorney indicating a claim in the amount of $1,400,000 from the Veterans Hospital was never recorded in NALIC's documents or information. Under the contract, Option had to report every month the outstanding claims and that needed to be paid. They found several claims that were not reported, and a reserve was not allocated, such as: Hospital Pavia, Mayaguez Medical Hospital, HIMA which had a claim of over $1,000,000, Health South Company, and Hospital El Maestro. The claims totaled around $10,000,000, and within the nine-month period in clause there were more than $5,000,000 in claims. Quantities that make the $300,000 request absurd. He requested that a table be prepared of twenty (20) cases that were within that nine-month period to make sure that they were not presented to NALIC as previously owed.

NALIC was ultimately responsible in making the payments to the service providers under the plan. Under Puerto Rico law, the only person or entity who can have a health insurance plan is an insurance company. Option is a general corporation and has no authority under the law to issue a health insurance plan. Multinational Life, known before as NALIC, is the only entity with the license by the Office of the Insurance Commissioner to transact this kind of business. The individual or entity who had the contract with the Administración de Seguros de Salud ("ASES") (Health Insurance Administration) to provide a health plan to the employees that accepted is NALIC. Option is just a third party or a contractor. It would be illegal for Option to perform the services to insurers. In their internal relation, Option is responsible to NALIC. The claims

received by NALIC from March 3, 2012 to August 9, 2012 were in the amount of $554,923 (**Exhibit J**). **Exhibit I** is a sample of 20 cases and the amount is much higher than the $300,000 retainage. Option is only an agent of NALIC in connection with the administration of the plan that NALIC retains the ultimate responsibility for claims made pursuant to the plan and shall have all liability for funding of benefits under the plan.

The term guarantee in the purchase agreement means to guarantee if there is any change in the financial statements that they were able to evaluate, given the sales price for the stock. If there is an obligation that was not indicated in those financial statements, those monies will guarantee whatever amounts were against the company. Under that contract, no payment has to be made to activate the clause. Ancon did not have an obligation to notify NAPRO of any arising obligations. The reserves in the amount of $300,000, as compared to the obligations not reflected in the financial statements prior to the transaction, are minimal. For example, the J.A. Gonzalez settlement agreement of $1,000,000 that was not indicated in the financial statements. The capital of the company was stated as $8,000,000, and one month later it was a negative $1,000,000, which is not even the minimum amount required under the insurance law that would have the effect of liquidating the company if more capital is not brought in, makes the plaintiff's request unmeritorious.

## Post Hearing Submissions of Proposed Findings of Fact

On February 13, 2019, the Debtor/Plaintiff filed its *Motion Submitting Debtor's Statement of Facts and Conclusions of Law* (Docket No. 195). On February 14, 2019, the Defendant filed its *Proposed Findings of Fact and Conclusions of Law* (Docket No. 197). On February 21, 2019, the Debtor/Plaintiff filed a *Motion to Inform Intent to Object to Belated Proposed Findings of Fact and Conclusion of Law filed by Ancon at Docket No. 197* (Docket No. 198). On February 21, 2019, Ancon filed a *Motion Informing Intent to Oppose and Reply to Unfounded Finding of Facts Filed by Debtor* (Docket No. 199). On March 7, 2019, the Debtor/Plaintiff filed an *Objection to Belated Proposed Findings of Fact and Conclusions of Law Filed by Ancon at Docket No. 197* (Docket No. 200). On March 8, 2019, Ancon filed its *Response to Debtor's*

*Statement of Facts and Conclusions of Law* (Docket No. 203). On March 12, 2019, Ancon filed a *Motion Clarifying Filing of Response* requesting the court to substitute docket #203 and consider this motion as the correct response to Debtor's statement of facts and conclusion of law (Docket No. 204). On March 13, 2019, NAPRO filed a *Motion Requesting Leave to State Position as to Docket Nos. 203 and 204* (Docket No. 205). On March 13, 2019, NAPRO filed its *Position as to Docket Nos. 203 and 204 and Motion to Strike New Evidence Not Previously Presented* (Docket No. 206). On May 1, 2019, the court granted NAPRO's *Motion Requesting Leave to State Position as to Docket Nos. 203 and 204* (Docket No. 205) (Docket No. 207).

**Findings of Fact**

After considering the parties' proposed findings of fact, the evidence presented and the testimonies of the witnesses, the court finds that the following facts are not in controversy.

1. Mr. Carlos Benitez is the majority stockholder of NAPRO.

2. NAPRO owned stocks in NALIC.

3. On May 17, 2011, the Office of the Insurance Commissioner issued an order to NALIC prohibiting sales, liquidation transfers of assets, etc. to safeguard the assets of the company (**Exhibit 7**).

4. NIC was being liquidated by the Office of the Insurance Commissioner.

5. On August 26, 2011, A.M. Best downgraded the financial strength rating of NALIC from B-(fair) to C++ (marginal) (**Exhibit 8**).

6. On October 11, 2011, Ancon acquired for $6,000,000 the assets of NIC, which included various real estate in Puerto Rico and in the mainland United States, furnishing and fixtures, works of art, computer programs and other personal property, including 48.81% of the shares in NALIC (**Exhibit 6**).

7. On November 10, 2011, the sellers (NAPRO, CMB, Eagle and Benitez-Rivera) executed with the purchaser (Ancon), a Private Agreement of Sale of Shares and Other Matters, by which the second acquired from the first all of their respective shares in NALIC. NAPRO (116,746.50 shares); Mr. Carlos Benitez Rivera (2,165 shares); Eagle Star Professional Services,

Inc. (709 shares) and from Carlos Benitez, Inc. (2 shares). The sellers were represented by Benitez-Rivera and Carrero-Nacar represented Ancon. (**Joint Exhibit 1**).

8. The purchase price was $2,566,000.00, amount that was distributed by the sellers in accordance with the number of shares owned by each one. NAPRO's monetary participation was in the amount of $2,504,307.00. The parties agreed to deduct $300,000 which was to remain in an escrow account. NAPRO received the amount of $2,204,307.00 (**Joint Exhibit 1, clauses 4 & 7**).

9. The Fourth Clause of the Agreement reads as follows:

"FOURTH: The sales price of the totality of the shares that belong to the Seller, will be TWO MILLION FIVE HUNDRED SIXTY-SIX THOUSAND DOLLARS ($2,566,000.00). This amount shall be distributed in accordance with the number of shares that each selling entity possesses. Of this amount, the parties agree that the Buyer shall deposit in an escrow account the sum of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) corresponding to NAPRO, which shall be reserved for nine (9) months in order to guarantee those obligations not reflected in the financial statements as of September 30, 2011, caused to National Life Insurance Company (hereinafter NALIC) by the officers and/or directors of said entity, while Mr. Carlos M. Benitez Rivera acted as president of the Board of Directors. After such nine (9) month period has passed, to the extent that all or part of the sum has not been consumed, the balance, if any, of the aforementioned amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) shall be returned to NAPRO"

10. The financial statements as of September 30, 2011 referred to in fourth clause are: the 2009 Annual Financial Statements (**Exhibit A**); the 2010 Annual Financial Statements (**Exhibit B**) and the September 30, 2011 Quarterly Financial Statements (**Exhibit C**).

11. The 2009 and 2010 annual statements of NALIC available to Ancon when it purchased NALIC's shares were not audited. Ancon examined three financial statements prior to the signature of the agreement, namely: the 2009 annual statement (**Exhibit A**); the 2010 annual statement (**Exhibit B**) as well as the quarterly financial statement of September 30, 2011 (**Exhibit C**).

12. On January 20, 2012, two months after the execution of the Agreement, Price Waterhouse Coopers, LLC (PwC), an independent auditor, rendered Statutory Basis Financial

Statements for the years ended December 31, 2010 and 2009 (Restated). In the same document it also restated its own audited financial statement of 2009 (**Exhibit D**).

13. Ms. Yadira Mercado signed the 2010 unaudited financial statement as senior vice president of finance of NALIC, while Mr. Carlos Benitez Rivera was president of the Board of Directors.

14. Ms. Yadira Mercado signed the quarterly financial statement of September 30, 2011, as senior vice president of finance of NALIC, while Mr. Carlos Benitez Rivera was president of the Board of Directors.

15. Ms. Yadira Mercado continues to work at NALIC, now Multinational Life Insurance Company.

16. Ms. Yadira Mercado, as senior vice president of finance of Multinational Life Insurance Company, signed the amended financial statements for the years 2009 and 2010.

17. Ancon did not open an escrow account for the $300,000 retainage because it determined the action unnecessary considering their financial strength and also found that there were claims, risks and unknown losses caused by NALIC that surpassed $300,000.00 (**Exhibit 4, supplemental answer 7 & 8**). Among these claims, risks and unknown losses were $5,500,000 write-off of non-admitted health insurance plan of uncollected premiums; $2,500,000 write-off of non-admitted accounts receivables and net-working fund balance from health insurance plan Third Party Administrator (Option); $3,700,000 write-off of non-admitted receiv[able] from former affiliate NIC; and $1,300,000 write-off of uncollected reinsurance recoverable" (**Exhibit 4, pg. 7, supplemental answer to interrogatory #8**). The omission, considering the totality of the circumstances, was of no adverse consequence to the plaintiff.

18. Mr. Tobias Carrero has been in the insurance business for over 40 years. Mr. Carrero has nine (9) insurance companies in Puerto Rico, Panamá, Venezuela and Curacao. Mr. Carrero

was contacted because NIC was in financial trouble and the Office of the Insurance Commissioner was looking for potential purchasers and Mr. Carrero was contacted as a potential purchaser.

19. Mr. Carrero had a team of professionals including accountants, attorneys, consultants and other professionals that performed the due diligence needed in order to acquire the assets of NIC and thereafter the shares of NALIC. Mr. Carrero and his team analyzed the August 26, 2011 A.M. Best news release that downgraded the financial strength rating of NALIC.

20. Mr. Carrero had several conversations with Mr. Carlos Benitez, who at the time of the agreement was the president of the Board of Directors of NALIC. Some days before signing the agreement, he obtained a preliminary report dated September 2011 through upper management which was the report used to execute the purchase agreement.

21. The amended 2010 annual statement disclosed the exact same amount for Reserves: Life and Health and Accident Reserves as the original 2010 annual statement (**Exhibit B, pg. 3, line item 2,** Aggregate Reserve for Life Contracts: $88,534,834 and Reserve for accident and Health: $12,339,568); (**Exhibit 13, pg. 3, line item 2**, Aggregate Reserve for Life Contracts: $88,534,834 and Reserve for accident and Health: $12,339,568).

22. Mr. Carrero reviewed the quarterly financial statement as of September 30, 2011 (**Exhibit C**) and confirmed that the reserve amounts including the reserves for health and accident for the prior year (December 31, 2010) were the same amounts included in the 2010 amended financial statements (**Exhibit 13**), which was exactly the same reserve amount for these items disclosed in the original 2010 annual statement available as of the date of the transaction (**Exhibit B**).

23. Ms. Yadira Mercado was the senior vice president of NALIC during 2010-2011, while Mr. Carlos Benitez Rivera was president of the Board of Directors. The financial statements are

the responsibility of the Company's (NALIC) management (**Exhibit D, Report of Independent Auditors, pg. 3**). She was part of the management during 2010-2011.

24. Ms. Mercado participated in the preparation and signed the original 2010 financial statement and she also signed the amended 2010 annual statement. She amended the 2010 annual statement on January 20, 2012, and the 2009 annual statement on January 23, 2012. She did not sign the original 2009 but did sign the amended 2009. She also signed the non-audited original 2011 quarterly financial statement as of September 30, 2011, available as of the date of the transaction.

25. The 2009 and 2010 financial statements were amended because of an audit performed by PwC in January 2012 (**Exhibits D, 12 & 13**).

26. The Company (NALIC) restated the 2009 statutory financial statements to correct for errors (**Exhibit D, pg. 3, paragraph 6**).

27. The appraised value of the real property was reduced from $11,229,473 to $8,418,760 in the 2009 amended financial statement since there was no authorization from the Office of the Insurance Commissioner to use appraisal values, but during 2010, the value was increased due to the acceptance by the Office of the Insurance Commissioner to write up the value of the property to its appraised value.

28. An account receivable in the amount of $2,300,000 was written-off from the financial statements as due from parent company NIC to NALIC.

29. The amended 2009 Annual Statement was restated as a result of the findings of the audited report to include new obligations not known by Ancon prior to the transaction. Additionally, the 2010 Annual Report was amended to also include new obligations not known by Ancon prior to the transaction (**Exhibit D**).

30. The audited report rendered by PwC states that it was necessary to restate its statutory financial statements for the year ended December 31, 2009 due to errors (**Exhibit D, pg. 11**).

31. Immediately after that statement, NALIC identified three errors in the 2009 Annual Statement that particularly affected the liabilities of the company, to wit:

a. An adjustment was required to correct an error in the aggregate reserves of life and annuity multi-term policies for Florida from 2006-2009 (**Exhibit D, pg.11, bullet 3**).

b. The 2009 financial statements did not reflect a contingent liability for a legal claim against NALIC (**Exhibit D, pg. 11, bullet 4**).

c. The 2009 financial statements did not reflect the accounting for NALIC's pension plan in accordance with SSAP No. 89- Accounting for Pensions (**Exhibit D, pg. 11, bullet 5**).

32. In the 2009 Annual Statement, NALIC reported an Aggregate Reserve for Life and Annuities in the amount of $87,652,446. See **Exhibit A, pg. 3,** titled "Liabilities, Surplus and Other Funds," line 1 titled "Aggregate Reserves for Life Contracts." NALIC corrected the above referred amount of $87,652,446 to $92,066,994, a difference of $4,414,538 (**Exhibit D, pg. 12, line 10** of the Table titled "Statement of Admitted Assets, Liabilities, Capital and Surplus (Statutory Basis))."

33. NALIC recognized that the Accounts Payables and Other Liabilities of the company needed to be adjusted from the original amount of $2,482,410 to the adjusted amount of $9,374,113, a difference of $6,891,703 (**Exhibit D, pg. 12, line 11** of the Table titled, Statement of Admitted Assets, Liabilities, Capital and Surplus (Statutory Basis)."

34. NALIC recognized that an adjustment of $1,000,000 needed to be made to the 2010 Annual Statement reviewed by Ancon prior to the signature of the Agreement (**Exhibit D, pg. 27**, Table specifically referring to legal settlement).

-43-

35. The third error recognized by NALIC is related to the Pension Plan of the Company. When the total accumulated vested benefits are higher than the assets of the Pension Plan then an underfunding of the Plan must be reflected as a liability of the Company. NALIC recognized an underfunding liability in the amount of $3,934,786 for the year 2009 as well as $4,251, 769 for the year 2010 (**Exhibit D, pgs. 24-25,** specifically the Table on page 25 titled, "The Funded Status of the Pension Plan as December 31, 2010 and December 31, 2009").

36. As a result of the errors found by PwC, Multinational Life amended both the 2009 and 2010 annual statements to include the necessary adjustments.

37. In the original 2010 annual statement the amount reflected as "other accounts payable" was $2,532 (**Exhibit B, pg. 3, line 2502**). PwC found that a legal settlement of $1,000,000 was not reflected in the 2010 annual statement. Thus, based on such findings Multinational Life amended line 2502 "other accounts payable" to reflect the amount of $1,002,530 to include the $1,000,000 not reflected in the original 2010 annual statement (**Exhibit 13, pg. 3, line 2502**).

38. In the year 2013, the company reached an agreement to pay approximately $2,600,000 for the withdrawal of the pension benefit plan. The payment was made in the year 2014 (**Exhibit 14**).

39. The difference between the original 2009 annual statement and the amended 2009 annual statement life reserve is approximately 5%. The health reserves in the original 2009 annual statement and the 2009 amended statement disclosed the same reserve amounts.

40. Management was aware of the agreement between NALIC and Option as the third-party administrator for the health services and that there was a problem with Option because they were not sending to NALIC timely reports with the information on pending claims, or claims paid.

41. Mr. Carlos Iguina is currently the president of Multinational Life Insurance Company, previously NALIC. He was directly involved in the negotiations and the drafting of the documents along with Mr. Carlos Benitez, attorney Yelitza Cruz and Mr. Carrero.

42. The claims received by NALIC from March 3, 2012 to August 9, 2012 were in the amount of $554,923 (**Exhibit J**). **Exhibit I** is a sample of 20 cases that consisted of claims during the time frame of the contact which far exceeded the $300,000 of this case.

43. Attorney Iguina signed twenty (20) settlement agreements with medical service providers in which Multinational Life paid for claims Option did not pay. The claims totaled around $10,000,000, and within the nine-month period in clause there were more than $5,000,000 in claims.

#### **Discussion**

The key issue before the court is the interpretation of clause four (4) of the "Acuerdo Privado de Compraventa de Acciones y Sobre Otros Extremos" (Private Purchase and Sale Agreement of Shares and Other Matters).

The first legal issue that the Debtor/Plaintiff raised is that the contract clause that provided the Defendant the right to retain the $300,000.00 for actions of the corporation while the previous officers were in charge is not a valid clause against the Debtor pursuant to the doctrine established in Bangor Punta Operations, Inc. v. Bangor & A.R. Co., 417 U.S. 703 (1974). At the October 10, 2018 evidentiary hearing, NAPRO restated its arguments regarding the nullity of the fourth clause. The Debtor/Plaintiff contends that "Bangor provides that the new shareholders of a corporation do not have standing to claim to the corporation (herein, Debtor) for actions that transpired while the previous owners were in possession of the shares since there is no 'contemporaneous ownership rule.' Therefore, "the Debtor is not liable to the new shareholders which were not shareholders while the 'supposed' actions of the officers and directors, occurred".

-45-

The Plaintiff argued at the evidentiary hearing that there was no contemporaneous ownership of Ancon when those actions took place. The state court stated in a complaint against Mr. Carlos Benitez Rivera and others in their personal capacity that the kind of retention of monies was null and void under the case of <u>Bangor Punta</u>. The state court further stated that there will be an undue gain for these shareholders retaining the purchase price because they purchased during an ongoing liquidation of assets in distress. The Supreme Court of Puerto Rico's decision discussing <u>Bangor determined that</u> any contract disposition making the Debtor liable to the new shareholders for actions by officers and directors, when they were not shareholders, is against the law, null and void. Therefore, under <u>Bangor Punta</u>, a purchaser (Ancon) cannot claim from the seller (NAPRO) of the shares for alleged acts of negligent administration that could have occurred prior to the purchase and sale of assets. Plaintiff contends that there is no evidence of fraud or malicious acts in the sale of the shares to Defendant, and Defendant purchased the shares of NALIC at a discount considering the distress position of other related parties, which assets Defendant also purchased at a discount" (Docket No. 156).

The Defendant counters and contends that the case of <u>Bangor</u> is not applicable to the instant case because Ancon is not suing NAPRO, it is NAPRO who is suing Ancon. Ancon has presented as an affirmative defense to the complaint filed by NAPRO that the $300,000 reserved under the fourth clause of the Agreement has been consumed by obligations not reflected in the financial statements as of September 30, 2011. NAPRO's argument based on what was established by the Supreme Court of Puerto Rico in the case of <u>Multinational Life Insurance Company v. Carlos Benitez Rivera; Edgardo Van Rhyn Soler, et als.</u>, 193 D.P.R. 67, is misplaced. The Supreme Court of Puerto Rico resolved in the case of Multinational Life that the case of <u>Bangor Punta</u> is inapplicable in the civil action and the company could continue its direct claim against its past directors and officers for alleged acts of mismanagement. The controversy that is

before the consideration of this court involves a contractual clause agreed to by sophisticated parties that were represented by lawyers and not a civil action by Ancon against the officers and directors of NALIC, now Multinational Life.

### Bangor Punta Operations, Inc. v. Bangor & A.R. Co., 417 U.S. 703, 41 L. Ed. 2d. 418, 94 S. Ct. 2578 (1974)

Bangor Punta Operations, Inc. v. Bangor & A.R. Co. was in the context of a shareholder derivative action lawsuit pursuant to Fed. R. Civ. P. 23.1(b)(1), which requires that the plaintiff in the complaint plead that it was a shareholder or member at the time of the transaction of which the complaint is premised upon. This requirement is known as the contemporaneous ownership rule. In the case of Bangor Punta, the railroad's current primary shareholder (Amoskeag Co.) had purchased more than 99% of the railroad's shares from the former owners (Bangor Punta controlled and directed Bangor & A.R. Co., through its ownership of about 98.3% of the outstanding stock) long after the alleged wrongs took place. The primary shareholder in Bangor Punta was seeking damages from its former owners based on corporate mismanagement under §10 of the Clayton Act, 15 U.S.C.S. §20, §10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. §78j(b), 17 C.F.R. §240.10-b-5, and §104 of the Maine Public Utilities Act, Me. Rev. Stat. Ann. Tit. 35, §104. The court held that a shareholder may not complain of acts of corporate mismanagement if it acquired its shares from those that participated in the alleged wrongful transactions. "This principle has been invoked with special force where a shareholder purchases all or substantially all the shares of a corporation from a vendor at a fair price, and then seeks to have the corporation recover against that vendor for prior corporate mismanagement (citations omitted). The equitable considerations precluding recovery in such cases were explicated long ago by Dean (then Commissioner) Roscoe Pound in Home Fire Insurance Co. v. Barber, *supra.* Dean Pound, writing for the Supreme Court of Nebraska, observed that the shareholders of the

plaintiff corporation in that case had sustained no injury since they had acquired their shares from the alleged wrongdoers after the disputed transactions occurred and had received full value for their purchase price. Thus, any recovery on their part would constitute a windfall, for it would enable them to obtain funds to which they had no just title or claim. Moreover, it would in effect allow the shareholders to recoup a large part of the price they agreed to pay for their shares, notwithstanding the fact that they received all they had bargained for. Finally, it would permit the shareholders to reap a profit from wrongs done to others, thus encouraging further such speculation. Dean Pound stated that these consequences rendered any recovery highly inequitable and mandated dismissal of the suit" Id. at 710-711.

The court finds that the case of Bangor Punta is framed within a shareholder derivative action lawsuit for corporate mismanagement that occurred long before the plaintiff, which is the purchaser of the majority of the shares, acquired its shares. Moreover, pursuant to Fed. R. Civ. P. 23.1(b)(1) the complaint must include in the pleadings that it was a shareholder or member at the time of the transaction of which the complaint is premised upon. Unlike Bangor Punta, in the instant adversary proceeding, Ancon is the defendant to a recovery of monies action based upon a private stock purchase agreement regarding the sale of NALIC stock by NAPRO. The instant adversary proceeding is an alleged breach of contract action based upon the fourth clause of a private agreement for the sale of shares in which certain monies ($300,000) were retained as a condition to future obligations not reflected as of September 30, 2011, caused by the board of directors and officers of NALIC, within a nine-month period of the closing of the purchase sale share transaction. Unlike Bangor Punta, there is no windfall for Ancon for damages sustained by others premised on a shareholder derivative action lawsuit for corporate mismanagement under the Clayton Act and the Securities Exchange Act of 1934 which would considerably lower the purchase price of the shares. The breach of contract and collection of monies action filed by the

Debtor/Plaintiff in this adversary proceeding is completely distinct and is within a different context, the focus of which is the private agreement of sale of shares which was negotiated by sophisticated parties on both ends, as compared to a shareholder derivate lawsuit in the case of Bangor Punta in which the new shareholder wanted to reap in the monetary recoveries for damages sustained by the previous shareholders based upon corporate mismanagement. Two complaints based on very different transactions and requested remedies and thus, premised on different legal foundations. Therefore, the court finds that the application of the Bangor Punta case to the instant adversary proceeding is inapposite and bears no similarities in facts or in the applicable law to the instant adversary proceeding.

### Multinational Life Insurance Company v. Carlos Benitez Rivera; Edgardo Van Rhyn Soler, et als., 193 D.P.R. 67 (2015)

Multinational Life Insurance Company v. Carlos Benitez Rivera; Edgardo Van Rhyn Soler, et als., the Supreme Court of Puerto Rico held that the case of Bangor Punta Operations, Inc. v. Bangor & A.R. Co., is distinguishable and clearly inapplicable and, thus, the lower forums erred in dismissing the various causes of action against the previous directors and officers of NALIC which were based on alleged fraudulent transactions and violations of the Puerto Rico Insurance Code. In the Bangor Punta case, the Supreme Court held that a purchaser may not claim from a seller of stocks for alleged acts of corporate mismanagement that occurred prior to the stock purchase transaction. The Supreme Court of Puerto Rico held that in the state court case, the corporation had not filed a lawsuit against the sellers of the shares, but against its former directors and officers. The Supreme Court of Puerto Rico revoked the judgment of the Appellate Court and remanded the case to the court of first instance for further proceedings.

The court finds that the case of Multinational Life Insurance Company v. Carlos Benitez Rivera; Edgardo Van Rhyn Soler, et als., is based upon different factual scenarios, causes of

action, and different legal foundations that do not bear any relevance in the instant adversary proceeding. Therefore, the court concludes that the argument that the fourth clause of the private agreement of sale of shares is not a valid clause because of the doctrine established in Bangor Punta Operations, Inc. v. Bangor & A.R. Co., 417 U.S. 703 is unfounded.

### Clause Four of the Purchase Agreement

The court now addresses the interpretation of clause four (4) of the "Acuerdo Privado de Compraventa de Acciones y Sobre Otros Extremos" (Private Purchase and Sale Agreement of Shares and Other Matters). It is an uncontested fact that an escrow account in the amount of $300,000 was not established due to the financial solvency Ancon had at the time and still has. At the time, they had two (2) accounts in two (2) different financial institutions in Puerto Rico with amounts much higher than $300,000. Thus, there was no need to open a bank account in particular for clause 4, and even if there was, the omission is of no adverse consequence to the Plaintiff.

Clause fourteen (14) of the agreement provides that the same shall be interpreted in conformity with the laws of the Commonwealth of Puerto Rico (Joint Exhibit 1, pgs. 5-6). Article 1207 of the Puerto Rico Civil Code provides: "[t]he contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order." 31 L.P.R.A. §3372. Article 1210 of the Puerto Rico Civil Code provides: "[c]ontracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfilment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law." 31 L.P.R.A. §3375.

Articles 1233 through 1241 of the Puerto Rico Civil Code govern contract interpretation under Puerto Rico law for contracts that require interpretation to determine the nature of the

obligation incurred by the parties. The pertinent articles of the Puerto Rico Civil Code are the following:

Article 1233 provides:

"[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail" 31 L.P.R.A. §3471.

Article 1234 provides:

"In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract" 31 L.P.R.A. §3472.

Article 1235 provides:

"However general the terms of the contract may be, there should not be understood as included therein things and cases different from those with regard to which the persons interested intended to contract" 31 L.P.R.A. §3473.

Article 1236 provides:

"If any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect." 31 L.P.R.A. §3474.

Article 1237 provides:

"The stipulations of a contract should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together." 31 L.P.R.A. §3475.

Article 1238 provides:

"Words which may have different meanings shall be understood in that which may be most in accordance with the nature and object of the contract." 31 L.P.R.A. §3476.

-51-

The fundamental criterion for contract interpretation in Puerto Rico is determining the contracting parties' real intent. See P.R. Tel. Co., Inc. v. Sprintcom, Inc., 662 F. 3d 74, 90-91 (1st Cir. 2011); See Marcial v. Tome, 1997 P.R. Eng. 871, 183, 144 P.R. Dec. 522, 537, 1997 Juris P.R. 146 (1997) ("Although the starting point of contract interpretation must be the expressions contained in the words, the trier cannot stop at the literal sense, but must fundamentally investigate the intent of the parties and the spirit and purpose of the transaction, as they are inferred from the overall conduct of the interested parties and from the concurring circumstances that may contribute to an adequate investigation of the will of the executing parties."). In addition, "[i]n determining the intent of the contracting parties it is important to take into consideration who the contracting parties are, as well as their experience and expertise with the subject matter of the contract." Unisys Puerto Rico, Inc. v. Ramallo Bros. Printing, Inc., 128 D.P.R. 842, 853 (1991).

Pursuant to Puerto Rico law, "when construing a contract, one must presuppose fairness, correction and good faith in its wording and construe it in such a manner that leads to results consonant with the contractual relationship as required by ethical standards. In other words, one cannot seek to obfuscate or distort the interpretation of contracts to reach absurd or unfair results." Autoridad de Carreteras y Transportacion v. Transcore Atl., Inc., 128 F. Supp. 3d 485 (D.P.R. 2015) citing Irizarry v. Garcia, 155 D.P.R. 713, 726 (2001).

An agreement is clear when it can "be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation" See Catullo v. Metzner, 834 F. 2d 1075, 1079 (1st Cir. 1987) (internal citation omitted). Therefore, "a court may not consider extrinsic evidence at all, if it finds that the terms of an agreement are clear." Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc., 96 F. 3d 10, 15 (1st Cir. 1996); Vulcan Tools of P.R.

v. Makita U.S.A., Inc., 23 F. 3d 564, 567 (1st Cir. 1994); See also; P.R. Tel. Co. v. Advanced Cellular Sys. (In re Advanced Cellular Sys.), 483. F. 3d 7, 12-13 (1st Cir. 2007).

Both parties agree that the terms of the private agreement and its clauses are clear since the same were drafted and negotiated by sophisticated parties. However, the parties disagree as to whether there were obligations that were not reflected in the financial statements as of September 30, 2011, within the nine (9) month period from the execution date of said agreement. The court understands that the phrase "obligations not reflected in the financial statements as of September 30, 2011" in clause four refers to financial obligations not reflected in financial statements; namely liabilities. Both parties have focused on presenting evidence to the court which consists of various financial statements of NALIC to evince their respective positions regarding the obligations (namely liabilities) and whether the same were reflected on NALIC's financial statements as of September 30, 2011.

The Fourth Clause of the Agreement reads as follows:

"FOURTH: The purchase and sale price for the totality of the Seller's shares shall be TWO MILLION FIVE HUNDRED SIXTY-SIX THOUSAND DOLLARS ($2,566,000.00). This amount shall be distributed in accordance with the number of shares that each selling entity possesses. Of this amount, the parties agree that the Buyer shall deposit in an escrow account the sum of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) corresponding to NAPRO, which shall be reserved for nine (9) months in order to guarantee those obligations not reflected in the financial statements as of September 30, 2011, caused to National Life Insurance Company (hereinafter NALIC) by the officers and/or directors of said entity, while Mr. Carlos M. Benitez Rivera acted as president of the Board of Directors. After such nine (9) month period has passed, to the extent that all or part of the sum has not been consumed, the balance, if any, of the aforementioned amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) shall be returned to NAPRO" (Docket No. 195, **Joint Exhibit 1**).

Both parties agree that the $300,000.00 which was retained by Ancon from the original purchase price of the shares was to guarantee the obligations not reflected in the financial

-53-

statements as of September 30, 2011. This is a conditional obligation pursuant to Article 1067[3]

of the Puerto Rico Code in which the acquisition of the right to attain the $300,000.00 depends

on a suspensive condition which is based upon the following: (i) whether there are obligations

that are not reflected on the financial statements as of September 30, 2011; (ii) whether these

obligations were caused by NALIC's officers and/or directors while Mr. Carlos M. Benitez was

President of NALIC; and (iii) these obligations that were not reflected in the financial statements

as of September 30, 2011 had to be detected within the nine (9) month period from the execution

of the private agreement (the reserve period). "An obligation subject to a suspensive condition

binds the debtor as soon as it is complied with. If it does not materialize, the debtor is relieved

from complying with the same." Meléndez v. Jimenez Realty, Inc., 98 P.R.R. 872 (1970).

The court clarifies and finds that the statutory accounting principles ("SAP") are the

accounting principles used by insurance companies to prepare the annual statements and the

audited financial statements. The court notes that the Report on Examination of Multinational

Life Insurance Company dated June 27, 2012 stated the following regarding the scope of the

examination, "[w]e conducted our examination in accordance with the National Association of

Insurance Commissioners Financial Condition Examiners Handbook (Handbook). The Handbook

requires that the examination be planned and performed to evaluate the financial condition and

identify prospective risks of the Company by obtaining information about the Company including

corporate governance, identifying and assessing inherent risks, and evaluating system controls

and procedures used to mitigate those risks. An examination also includes assessing the principles

used and significant estimates made by management, as well as evaluating the overall financial

---

[3] Article 1067 provides: "In conditional obligations, the acquisition of rights, as well as the extinction or loss of those already acquired, shall depend upon the event constituting the condition." 31 L.P.R.A. §3042.

statement presentation, management's compliance with Statutory Accounting Principles and annual statement instructions, as applicable to the Puerto Rico Insurance Laws and Regulations. All accounts and activities of the Company were considered in accordance with the risk-focused examination process." (**Exhibit 20**, pg. 2). The Report of Examination by the Office of the Insurance Commissioner, as part of the summary of significant findings, informed that, "[t]he Company was required by Rule XIV-A of the Regulations of the Insurance Code of Puerto Rico to file an audited financial report for the year ending December 31, 2010, on or before June 1, 2011. The Company asked for and was granted two extensions, June 30, 2011 and July 31, 2011, by the Office of the Insurance Commissioner (OCS). All further extension requests were denied. The Company filed its audited financial report on January 20, 2012. The Company was not in compliance with Rule XIV-A of the Regulations of the Insurance Code of Puerto Rico" (**Exhibit 20,** pg. 5). One of the significant findings was that, "[o]n January 23, 2012, the Company issued a restated 2010 annual statement, which indicated MLife [Multinational Life Insurance Company] was insolvent with capital and surplus totaling ($96,219)[4]" (**Exhibit 20**, pgs. 3, 24). The conclusion of the Report of Examination states in part the following: "[t]he insurance examination practices and procedures as promulgated by NAIC have been followed in ascertaining the financial condition of Multinational Life Insurance Company as of December 31, 2010, consistent with the Insurance Code of Puerto Rico. Pursuant to the examination findings, on January 23, 2012, the Company issued a restated 2010 annual statement, which indicated [Multinational Life Insurance Company] was insolvent with capital and surplus totaling ($96,219)" (**Exhibit 20**, pgs. 31, 22).

---

[4] The footnote included in the Report of Examination regarding the capital deficit reads: "On December 2011, and as a direct result of the change in control, additional $15,000,000 of capital was issued in the form of convertible preferred stock. Upon the capital infusion the Company was able to meet the minimum risk-based capital requirements." (**Exhibit 20**, footnote 1).

NALIC's audited statutory basis financial statements for December 31, 2010 and 2009 (Restated) explain that, "[a]s described in Note 1 to the financial statements, the Company prepared these financial statements using accounting practices prescribed or permitted by the Office of the Insurance Commissioner of the Commonwealth of Puerto Rico, which practices differ from accounting principles generally accepted in the United States of America. The effects on the financial statements of the variances between the statutory basis of accounting and accounting principles generally accepted in the United States of America, although not reasonably determinable, are presumed to be material. In our opinion, because of the effects of the matters discussed in the preceding paragraph, the financial statements referred to above do not present fairly, in conformity with accounting principles generally accepted in the United States of America, the financial position of the Company as of December 31, 2010 and 2009 (restated), or the results of its operations and its cash flow for the years then ended. In our opinion, the financial statements referred to above present fairly, in all material respects, the admitted assets, liabilities, capital and surplus of the Company as of December 31, 2010 and 2009 (restated), and the results of its operations and its cash flow for the years then ended, on the basis of accounting in Note 1 to the financial statements. As described in Note 2 to the financial statements, the Company restated its 2009 statutory financial statements to correct for errors." (**Exhibit D**, pg. 3).  Note 1 of the audited financial statements explains that the "accompanying financial statements have been prepared in conformity with accounting practices prescribed or permitted ("SAP") by the Commissioner of Insurance of the Commonwealth of Puerto Rico, which is a comprehensive basis of accounting other than accounting principles generally accepted in the United States of America ("GAAP")." Then it lists the differences between SAP and GAAP (**Exhibit D,** pg. 5). As explained in the audit opinion, the "… audit was conducted for the purpose of forming an opinion on the basic statutory basis financial statements taken as a whole" (**Exhibit D**, pg. 4).

The audited financial statements were audited pursuant to the statutory accounting principles which are the accounting principles used for insurance companies, not the generally accepted accounting principles. Also, the Report on Examination for Multinational Life Insurance Company as of December 31, 2010, performed by the Office of the Commissioner of Insurance focused on management's compliance with Statutory Accounting Principles, as applicable to the Puerto Rico Insurance Laws and Regulations.

It is important to understand that the statutory statements of admitted assets, liabilities, capital and surplus of NALIC as of December 31, 2010 and 2009 (restated) and the related statutory statements of income, of changes in capital and surplus, and of cash flow for the years then ended, were prepared by NALIC's management and are the responsibility of NALIC's management. In this report the only thing that belongs to the external auditor; namely PwC, is the opinion based on their audit.

The court notes that neither party presented an expert witness to explain the alleged obligations not reflected in the financial statements as of September 30, 2011, pursuant to the statutory accounting principles employed in the insurance industry; or to discuss the impact of the audited financial statements for the years ended December 31, 2010 and December 31, 2009 (restated) and the effects (impact/balance) of the adjustments that were made to NALIC's annual statements of 2009 and 2010 and the financial impact on these obligations (cumulative effect, if any) that carried into the quarterly statement as of September 30, 2011. The court will determine the specific financial accounting standards employed in the insurance industry regarding liability recognition when incurred and what are the requirements necessary for a contingent liability to be recognized and recorded on the balance sheet rather than just disclosed in the notes to the financial statements but not recorded on the balance sheet as a liability incurred based upon the evidence presented and the applicable accounting principles.

The court now will discuss whether there were obligations that were not reflected on NALIC's financial statements as of September 30, 2011. The analysis regarding the alleged obligations begins by defining the term liability pursuant to Statutory Issue Paper No. 5, titled Definition of liabilities, loss contingencies and Impairment of Assets. The term "liability is defined as, "[for] purposes of statutory accounting, a 'liability' shall be defined as certain or probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or to provide services to other entities in the future as a result of past transaction(s) or event(s). A liability has three essential characteristics: (a) it embodies a present duty or responsibility to one or more other entities that entails settlement by probable[5] future transfer or use of assets at a specified or determinable date, on occurrence of a specified event, or on demand, (b) the duty or responsibility obligates a particular entity, leaving it little or no discretion to avoid the future sacrifice, and (c) the transaction or other event obligating the entity has already happened. This includes, but is not limited to, liabilities arising from policyholder obligations (e.g. policy holders' benefits, reported claims and reserves for incurred but not reported claims). Liabilities shall be recorded on a Company's financial statements when incurred." SSAP No. 5.

The obligations/liabilities that were not included in NALIC's financial statements as of September 30, 2011, specifically refer to the following: (i) a contingent liability for a legal claim against the company; (ii) the 2009 and 2010 annual statements did not reflect the liability for NALIC's defined benefit pension plan in accordance with SSAP No. 89; (iii)  a $4,414,458

---

[5] *FASB Statement of Financial Accounting Concepts No. 6*, *Elements of Financial Statements* (CON 6), states:

Probable is used with its usual general meaning, rather than in a specific accounting or technical sense (such as that in *FASB Statement 5, Accounting for Contingencies,* par. 3), and refers to that which can reasonably be expected or believed on the basis of available evidence or logic but is neither certain nor proved...

adjustment was required in the Aggregate Reserves for Life and Annuities in the 2009 annual statement; and (iv) the amount reported by Option to NALIC as outstanding debt was substantially less than the real amount owed to the health providers.

### Contingent liability for a legal claim

NAPRO argues that the contingent liability was reflected in both the 2009 and 2010 financial statements because note 14, titled "Contingencies", of the annual statements disclosed the following: "the Company is subject to legal proceedings and claims in the ordinary course of business that have not been finally adjudicated. These actions, when finally concluded, will not, in the opinion of management and its legal counsel, have a material adverse effect upon the financial position or results of operations of the Company." (**Exhibit A**, pg. 19.4, note 14, **Exhibit B**, pg. 19.4, note 14). The financial statement for the quarter ended September 30, 2011, also includes the same note 14 titled, Contingencies with the same language (**Exhibit C,** pgs. 7.4-7.5, note 14). The Debtor/Plaintiff objected to Ancon's proposed findings of fact related to this obligation because, "…the same were fully disclosed in the financial statements at Item No. 14 'Contingencies.' Pending litigation was disclosed and any follow up on the matter should have been performed by the due diligence team of experts utilized by Ancon. This is not an omitted obligation as it was disclosed, and Ancon had ample opportunity to fully investigate. Their lack of due diligence should not be rewarded at this time." (Docket No. 200, pg. 4)

Note 2, titled "Restatement of Previously Issued Financial Statements and Correction of an Error," to the audited statutory basis financial statements as of December 31, 2010 and 2009 (restated), informs that the Company determined that it was necessary to restate its statutory financial statements for the year ended December 31, 2009, due to certain errors which were listed. Amongst the errors included there was an error in the 2009 financial statements that did not reflect a contingent liability for a legal claim against the Company (**Exhibit D, pg. 11**). There

were various adjustments to the December 31, 2009 financial statements as previously reported. One of the adjustments was an increase in the amount of $6,891,703 in the accounts payable and other liabilities (**Exhibit D, pg. 12**). In the restated 2009 financial statements, there is no further breakdown of the $6,891,703 increase in accounts payable and other liabilities into its major components.

The 2009 amended annual statement (**Exhibit 12, pg. 3**) in the Liabilities, Surplus and Other Funds, line item 25, Aggregate write-ins for liabilities, are in the amount of $8,161,881 and the detail of such write-ins amount is included further down the page, in a section titled, Details of Write-Ins. The original 2009 aggregate write-ins for liabilities was in the amount of $1,966,055 (**Exhibit A, pg. 3, line 25)** and in the amended 2009 the aggregate write-ins were in the amount of $8,161,881 (**Exhibit 12, pg. 3, line 25**). The differences in these two amounts were because other accounts payable increased from $58,630 to $2,598,623 due to the $2.5 million adjustment to record the obligation for the legal settlement.

The audited financial statements as of December 31, 2010, in Note 12 provide a reconciliation between assets, liabilities, capital and surplus, and net income as of December 31, 2010 and for the year then ended, reported in the Company's annual statement filed with the Puerto Rico Insurance Commissioner. In this table, one of the adjustments included for the year 2010 an increase in the liabilities of $1,000,000 for a legal settlement (**Exhibit D, pg. 27**).

The original 2010 aggregate write-ins for liabilities were in the amount of $1,990,869 (**Exhibit B, pg. 3, line 25)** and in the amended 2010 the aggregate write-ins were in the amount of $6,870,079 (**Exhibit 13, pg. 3, line 25**). The difference in these two amounts was due to the pension plan adjustment in the amount of $4,200,000 that was not reflected in the original 2010 statement, and also there was still $1,000,000 from the legal settlement which had not been included as a liability. In the original 2010 annual statement the amount reflected as "other

-60-

accounts payable" was $2,532 (**Exhibit B, pg. 3, line 2502**). PwC found that a legal settlement of $1,000,000 was not reflected in the 2010 annual statement. Thus, based on such findings, Multinational Life amended "other accounts payable" to reflect the amount of $1,002,530 to include the $1,000,000 not reflected in the original 2010 annual statement (**Exhibit 13, pg. 3, line 2502).** The quarterly statement as of September 30, 2011, recognizes the amount of $3,347,456 as the aggregate write-ins for liabilities of which $2,648,415 were allocated to Reinsurance Payable; $10,973 was allocated to Other Accounts Payable and $688,068 was allocated to Accounts Payable-Miscellaneous (**Exhibit C**, pg. 4, line 25; Details of Write-ins). Under the Details of Write-ins, the Other Accounts Payable for December 31, prior year recognized $2,532. Ms. Mercado testified that the quarterly statement for 2011 was not amended because at the time that the quarterly for 2011 was filed, they had not finished the amendments for 2010 and 2009 annual statements. The program they used did not allow for the quarterly statements to be amended because the beginning balances for 2011 were impacted by the 2010 and 2009 amendments.

The court finds that the statement for the quarter ended September 30, 2011, did not incorporate the adjustment (reconciling item) of the December 31, 2010 audited financial statements that comprised of the $1,000,000 as a liability for legal settlement or any of the other adjustments and reconciling items because the amended 2009 and 2010 annual statements were completed and filed in January 2012 which was after the September 30, 2011 quarterly statement had been completed and filed on November 10, 2011 (**Exhibit D**, pg. 27). Therefore, the court concludes that the beginning balances for the September 30, 2011 quarter financial statement which was December 31 of the prior year are misstated since at the time it was filed it did not account for the 2009 annual statement which was restated and the December 31, 2010 annual statement had not been amended.

The court also finds that note 14, which was included verbatim in NALIC's 2009 and 2010 original annual statements (**Exhibits A & B**) and in the September 30, 2011 quarterly statement (**Exhibit C**), has no relation and is contrary to the correction of an error in the 2009 financial statements, which had to be restated. NALIC disclosed in Note 2 to the restated 2009 financial statements (**Exhibit D**, pg. 11) that "[t]he Company determined it was necessary to restate its statutory financial statements for the year ended December 31, 2009 due to the following errors: … the 2009 financial statements did not reflect a contingent liability for a legal claim against the Company" (**Exhibit D**, pg. 11, bullet 4). NALIC, in its December 31, 2010 financial statements, included a legal settlement in the amount of $1,000,000 as a reconciling line item in its liabilities section of the balance sheet between the reported 2010 annual statements and the reported statutory financial statements (**Exhibit D**, pg. 27). Note 10 of the audited December 31, 2010 financial statements, titled Commitments and Contingencies, reads in pertinent part:

"The Company is subject to legal proceedings and claims in the ordinary course of business that has not been finally adjudicated. These actions, when finally concluded, will not, in the opinion of management and its legal counsel have a material adverse effect upon the financial position or results of operations of the Company.

During April 2010, the Company received a subpoena for documents from the Puerto Rico Department of Justice ("PRDOJ") requesting information principally related to the Asociación de Compañías de Seguros de Puerto Rico, Inc. ("ACODESE" by its Spanish acronym). The Company ceased to be a member of ACODESE, an insurance trade association established in Puerto Rico in 2007.

The Company believes similar subpoenas and information requests were issued to other member and other former member companies of ACODESE in connection with the investigation of alleged payments by the former Executive Vice President pf ACODESE to members of the Puerto Rico Legislative Assembly beginning in 2005. The Company, however, has not been informed of the specific subject matter of the investigations being conducted by the PRDOJ. The Company is fully complying with the subpoenas and the request for information and intends to cooperate with any related government investigation" (**Exhibit D**, pgs. 23-24).

Note 14 of the amended 2009 and 2010 annual statement reads in the same manner (**Exhibit 12**, pg. 19.13, note 14 & **Exhibit 13**, pg. 19.15, note 14). The amended 2009 and 2010

annual statements were filed on January 23, 2012 and January 20, 2012, respectively, approximately two months after the private agreement was executed. Note 14 in the original 2009 and 2010 annual statement and in the September 30, 2011 disclosed: "The Company is subject to legal proceedings and claims in the ordinary course of business that have not been finally adjudicated. These actions, when finally concluded, will not, in the opinion of management and its legal counsel have a material adverse effect upon the financial position or results of operations of the Company." (**Exhibit A**, pg. 19.4, note 14, **Exhibit B**, pg. 19.4-19.5, note 14, **Exhibit C**, pgs. 7.4-7.5, note 14).

The court finds that note 14 of the 2009 and 2010 annual statements is contrary to the amended December 31, 2010 and December 31, 2009 annual statements. In 2009 the company entered into a settlement for a legal claim in the amount of approximately $2,540,000, and it was not recorded as a liability in the previously issued 2009 financial statements. Management had the responsibility to include this liability, and because management failed to do it, the financials had to be restated. In the notes section to the original 2009 annual statement there is a general disclosure that there are contingencies, but that the same do not impact the annual statements. However, the note did not include specifically the contingency that had to be recorded.

The court finds that approximately two (2) months after the private agreement was executed, NALIC filed an amended December 31, 2010 annual statement in which it recognized a legal settlement of $1,000,000 as an incurred liability which is not contingent on pending legal proceedings. A legal settlement is not a contingent legal liability because it is not pending litigation against the business that may be resolved at a future point in time. This liability had been incurred but was not recognized by management and was not recorded as a liability in the balance sheet of NALIC's financial statements for the year ended December 31, 2010;  projecting that it had not impacted NALIC's balance sheet. Management did not comply with the directives

of SSAP No. 5[6] and failed to properly recognize and record the liability in its financial statements. Mere abstract disclosure in the notes to the financial statements is contrary to the guidelines and directives of SSAP No. 5.

---

[6] SSAP No. 5, titled, Definition of Liabilities, Loss Contingencies and Impairment of Assets provides in pertinent part:

"**Loss Contingencies or Impairments of Assets**
4. For purposes of implementing the statutory accounting principles of loss contingency or impairment of an asset described below the following additional definitions shall apply:

**Probable** - The future event or events are likely to occur.

**Reasonably Possible** - The chance of the future event or events occurring is more than remote but less than probable.

**Remote** - The chance of the future event or events occurring is slight.

5. A "loss contingency" or "impairment of an asset" is defined as an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an enterprise that will ultimately be resolved when one or more future event(s) occur or fail to occur (e.g., collection of receivables).

6. An estimated loss from a loss contingency or the impairment of an asset shall be recorded by a charge to operations if both of the following conditions are met:

a. Information available prior to issuance of the statutory financial statements indicates that it is probable that an asset has been impaired, or a liability has been incurred at the date of the statutory financial statements. It is implicit in this condition that it is probable that one or more future events will occur confirming the fact of the loss or incurrence of a liability, and

b. The amount of loss can be reasonably estimated.

7. This accounting shall be followed even though the application of other prescribed statutory accounting principles or valuation criteria may not require, or does not address, the recording of a particular liability or impairment of an asset (e.g., known impairment of an invested asset even though published VOS manual has not recognized impairment).

8. Additionally, in instances where a judgment, assessment or fine has been rendered against a company, there is a presumption that the criteria in paragraph 6.a. and 6.b. have been met. The amount of the liability shall include the anticipated settlement amount, legal costs, insurance recoveries and other related amounts and shall take into account factors such as the nature of the litigation, progress of the case, opinions of legal counsel, and management's intended response to the litigation, claim, or assessment.

9. When condition 6 a. above is met with respect to a particular loss contingency, and the reasonable estimate of the loss is a range, which meets condition 6 b. above, an amount shall be accrued for the loss. When an amount within management's estimate of the range of a loss appears to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the midpoint (mean) in the range shall be accrued. For purposes of this paragraph, it is assumed that management can quantify the high end of the range. If management determines that the high end of the range cannot be quantified, then a range does not exist,

The court concludes that the liability (obligation) in the amount of $1,000,000 for a legal settlement was not recorded or reflected in NALIC's financial statements as of December 31, 2010 (**Exhibit B**). In addition, the quarterly September 30, 2011 financial statements did not reflect the liability incurred of $1,000,000 of the legal settlement because the restated 2009 and amended 2010 financial statements were completed after the September 30, 2011 quarterly statement had been filed (**Exhibits C**, **12 & 13**). This particular liability (obligation) that was not reflected in the financial statements as of September 30, 2011 was detected on January 2012, well within the nine (9) month period after the execution of the private agreement on November 10, 2011. The court further finds that management is responsible for a company's financial statements and is also responsible for conducting the transactions and affairs of a company in conformity with the established accounting standards, financial principles and applicable laws. The officers of a corporation are appointed by the Board of Directors and are responsible for overseeing management and the day to day operations of the corporation. The Board of Directors is responsible for overseeing all management functions and decisions. The Board is responsible for the financial statements and the accompanying notes to the financial statements.

The court finds that the reference in the fourth clause, "… to the extent that all or part of the sum has not been consumed, the balance, if any, of the aforementioned amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) shall be returned to NAPRO" refers to the balance of the obligations being consumed, not to the actual payment of the obligations which

and management's best estimate shall be used.

**Disclosure**
10. If a loss contingency or impairment of an asset is not recorded because only one of the conditions 6 a. or 6 b. is met, or if exposure to a loss exists in excess of the amount accrued pursuant to the provisions described above, disclosure of the loss contingency or impairment of the asset shall be made in the notes to the financial statements when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made." SSAP. No. 5.

could be anytime in the future depending on the nature and terms of the obligation (liability). The parties themselves admit that the individuals involved in the negotiating and drafting of the private agreement are sophisticated parties, and if these sophisticated parties would have wanted to include as an additional condition not only to the consummation of the obligation balance but also the actual payment of said obligation they would have drafted the fourth clause accordingly.

<strong><u>NALIC's underfunding of the defined benefit pension plan</u></strong>

NAPRO argues that it proved that the financial statements included full disclosure of the underfunding of the pension plan (Docket No. 195, pg. 32). NAPRO's argument of full disclosure of the underfunding of the pension is based on Note 12 of the 2009 and 2010 annual statements (**Exhibit A**, pg. 19.3, note 12 and **Exhibit B**, pg. 19.3 note 12) and the quarterly statement as of September 30, 2011 (**Exhibit C**, pgs. 7.3-7.4, note 12). The Plaintiff also argues that in the year 2013 the amounts paid by Ancon to liquidate the pension plan were approximately $2,600,000 (**Exhibit 14**) and that this amount mirrors NALIC's disclosures in the Financial Statements of 2009-2011. See **Exhibits 16-A and 16-B**, Audited Financial Statement 2010 and Actuarial Report for Pension Plan 2011, which allegedly sustain the same disclosures in the financial statements for the years 2009-2011 (Docket No. 195, pg. 17). The Debtor/Plaintiff in its *Objection to Belated Proposed Findings of Fact and Conclusions of Law filed by Ancon at Docket No. 197* contends that the Financial Statements fully disclosed the underfunding of the Plan since 2009. See item No. 12 at page 19.3 of the 2009 Original Financial Statements. Plaintiff argues that the underfunding was never omitted since the original 2009 Financial Statements and that the same was also available to the expert team of specialized professionals utilized by Ancon to do the due diligence for the purchase of the shares. Debtor's **Exhibit 14** demonstrates that the Pension Plan liability for NALIC as of June 1, 2013 was $2,648,277, which corresponds to the approximate

amounts that were reflected in the 2009 and 2010 original financial statements. There was no new obligation that was newly discovered in the audit of the financial statements. (Docket No. 200).

Contrary to NAPRO, Ancon argues that there was an obligation in the amount of $3,934,786 for the year 2009 which increased to $4,251,761 in year 2010 related to the underfunding of the Pension Plan that was not reflected in the Financial Statements as of September 30, 2011 (Docket No. 197, pg. 16). The financial statements for the years ended December 31, 2009 (restated) and December 31, 2010 which were audited by PwC, "… for the first time recognized an underfunding liability in the amount of $3,934,786 for the year 2009 as well as $4,251,769 for [the] year 2010. It was the duty of the Directors and Officers of NALIC to assure that any underfunding related with the pension plan be included in the Financial Statements of the company." Ancon further argues that the disclosures in note 12 of the original 2009 and 2010 original annual statements were also incorrect because "Note 12 in the 2009 Annual Statement (original) showed an underfunding of $2,548,925 (**Exhibit A,** pgs. 19.3-19.4). Nevertheless, PwC concluded that the pension plan underfunding was $3,934,786, a difference in excess of $300,000 reserved in clause four. See **Exhibit D**, pg. 25. Similarly, Note 12 of the 2010 Annual Statement (original) showed a pension plan underfunding of $2,010,048. See **Exhibit B**, pgs. 19.3-19.4. Nevertheless, PwC found that the underfunding was $4,251,769, a difference in excess of the amount reserved of $300,000 under clause four. See **Exhibit D**, pg. 25" (Docket No. 197, pgs. 8-9).

Note 12 of the original 2009 annual statement is titled, Retirement Benefits, Deferred Compensation, Postemployment Benefits, Compensated Absences and Other Postretirement Benefits Plans, discloses the following:

"A. Defined Benefit Plan. i. The Company's employees participate in the retirement benefit plan of Carlos M. Benitez, Inc. (an affiliate). The plan is a qualified non-contributory defined benefit pension plan (the Plan) covering all employees who have one

year of service and have met certain age requirements. The Company is required to make annual contributions to the Plan, as determined by consulting actuaries, that should be at least the minimum funding requirement of ERISA. The Company charged to operations its annual contribution amounting to $105,312 for 2009 ($2008 $0). At December 31, 2007, latest actuarial valuation date, the Plan's total accumulated benefit obligation determined in accordance with ERISA regulations based on an assumed rate of return of investments of 7% was $11,831,243, including vested benefits of $11,831,243 and the Plan's assets were $9,282,318." (**Exhibit A, pgs. 19.3, note 12**).

Note 12 of the original 2010 annual statement is titled, Retirement Benefits, Deferred Compensation, Postemployment Benefits, Compensated Absences and Other Postretirement Benefits Plans, discloses the following:

"A. Defined Benefit Plan. i. The Company's employees participate in the retirement benefit plan of Carlos M. Benitez, Inc. (an affiliate). The plan is a qualified non-contributory defined benefit pension plan (the Plan) covering all employees who have one year of service and have met certain age requirements. The Company is required to make annual contributions to the Plan, as determined by consulting actuaries, that should be at least the minimum funding requirement of ERISA. In 2010 and 2009 the Company charged to operations contributions amounting to $117,453 and $105,312, respectively. At January 1, 2009, latest actuarial valuation date, the Plan's total accumulated benefit obligation determined in accordance with ERISA regulations based on an assumed rate of return of investments of 7% was $12,107,975 including vested benefits of $12,107,975 and the Plan's assets were $10,097,927." (**Exhibit B, pgs. 19.3-19.4, note 12**).

Note 12 of the quarterly statement ended September 30, 2011 is titled, Retirement Benefits, Deferred Compensation, Postemployment Benefits, Compensated Absences and Other Post Retirement Benefits Plans, discloses the following:

"A. Defined Benefit Plan. i. The Company's employees participate in the retirement benefit plan of Carlos M. Benitez, Inc. (an affiliate). The plan is a qualified non-contributory defined benefit pension plan (the Plan) covering all employees who have one year of service and have met certain age requirements. The Company is required to make annual contributions to the Plan, as determined by consulting actuaries, that should be at least the minimum funding requirement of ERISA. In 2011 and 2010 the Company charged to operations contributions amounting to $127,883 and $117,453, respectively. At January 1, 2009, latest actuarial valuation date, the Plan's total accumulated benefit obligation determined in accordance with ERISA regulations based on an assumed rate of return of investments of 7% was $12,107,975 including vested benefits of $12,107,975 and the Plan's assets were $10,097,927." (**Exhibit C, pgs. 7.3-7.4, note 12**).

Pursuant to note 12 of NALIC's 2009 annual statements, the underfunding of the defined benefit pension plan liability as of the December 31, 2007 actuarial valuation date was in the amount of $2,548,925 (vested benefits $11,831,243 minus $9,282,318 Plan's assets). However, pursuant to note 12 of NALIC's 2010 annual statements and the quarterly statement for the quarter ended September 30, 2011, the underfunding defined benefit pension plan liability as of the latest valuation date which was January 1, 2009 was in the amount of $2,010,048 (vested benefits $12,107,975 minus $10,097,927 Plan's assets). The difference between the latest actuarial valuation date and the amount paid for the withdrawal of the pension plan is $638,229 ($2,648,277 - $2,010,048). Thus, the Plaintiff's argument that the Pension Plan liability for NALIC as of June 1, 2013 was in the amount of $2,648,277 (**Exhibit 14**) and that this corresponds to the approximate amounts that were reflected in the 2009 and 2010 original financial statements is incorrect. The withdrawal liability as of June 1, 2013 for NALIC's defined benefit pension plan is not indicative of the defined pension benefit liability pursuant to the financial statements as of September 30, 2011.

Note 2, titled "Restatement of Previously Issued Financial Statements and Correction of an Error," to the audited statutory basis financial statements as of December 31, 2010 and 2009 (restated), informs that the Company determined that it was necessary to restate its statutory financial statements for the year ended December 31, 2009 due to errors included in the 2009 financial statements that did not reflect the accounting for the Company's pension plan in accordance with SSAP No. 89- Accounting for Pensions (**Exhibit D, pg. 11**). There were various adjustments to the December 31, 2009 financial statements as previously reported, including an increase in the amount of $6,891,703 in the Accounts payable and other liabilities (**Exhibit D, pg. 12**). In the restated 2009 financial statements there is no breakdown of the $6,891,703 increase in Accounts Payables and other liabilities into its major components.

The 2009 amended annual statement (**Exhibit 12, pg. 3**) shows that the Liabilities, Surplus and Other Funds, line item 25, Aggregate write-ins for liabilities are in the amount of $8,161,881. The detail of such write-ins amount is included further down the page, in a section titled, Details of Write-Ins. According to the testimony of Ms. Mercado, the original 2009 aggregate write-ins for liabilities was in the amount of $1,966,055 (**Exhibit A, pg. 3, line 25)** and in the amended 2009 the aggregate write-ins was in the amount of $8,161,881 (**Exhibit 12, pg. 3, line 25**). The amended 2009 annual statement discloses in line 2598, summary of remaining write-ins, the amount of $3,655,810, which is mainly a result of the pension plan minimum liability underfunding adjustment which was not accounted for originally. The original 2009 annual statement in line 2598 discloses an amount of $0. Page 53 of the amended 2009 annual statements is the overflow of write-ins which is the additional liability pension cost of $3,532,791 as a result of the adjustment previously mentioned (**Exhibit 12, pg. 53**).

The amended 2009 annual statement amended note 12 includes a table regarding the funded status of the pension plans at December 31, 2010 and December 31, 2009. The table discloses that as of December 31, 2009, the pension plan is underfunded in the amount of $3,934,786 (**Exhibit 12**, pgs. 19.11-19.12, note 12). The court notes that this is the same note as that included in the December 31, 2010 and 2009 (restated) financial statements (**Exhibit D**, pgs. 24-26, note 11).

The audited financial statements as of December 31, 2010, in Note 12 provide a reconciliation between assets, liabilities, capital and surplus, and net income as of December 31, 2010 and for the year then ended, reported in the Company's annual statement filed with the Puerto Rico Insurance Commissioner. In this table, one of the adjustments for the year 2010 that was included was an increase in the liabilities of $4,251,769 for additional minimum pension liability and pension cost (**Exhibit D, pg. 27**). The original 2010 aggregate write-ins for liabilities

was in the amount of $1,990,869 (**Exhibit B, pg. 3, line 25**) and in the amended 2010 the aggregate write-ins were in the amount of $6,870,079 (**Exhibit 13, pg. 3, line 25**). The difference in these two amounts was mainly because of the pension plan adjustment in the amount of $4,200,000 million was not reflected in the original 2010 and also there was still $1,000,000 from the legal settlement which had not been included as a liability.

The quarterly statement as of September 30, 2011, recognizes the amount of $3,347,456 as the aggregate write-ins for liabilities, of which $2,648,415 were allocated to Reinsurance Payable; $10,973 was allocated to Other Accounts Payable and $688,068 was allocated to Accounts Payable-Miscellaneous (**Exhibit C**, pg. 4, line 25; Details of Write-ins). Under the Details of Write-ins, the Other Accounts Payable for December 31, prior year recognized $2,532 and the Accounts Payable-Miscellaneous for the prior year recognized was in the amount of $917,737.

The court finds that the statement for the quarter ended September 30, 2011, did not incorporate the adjustment (reconciling item) of the December 31, 2010 audited financial statements that comprised of the $4,251,769 as an additional minimum pension liability and pension cost or any of the other adjustments and reconciling items because the amended 2009 and 2010 annual statements were completed and filed in January 2012, which was after the September 30, 2011 quarterly statement had been completed and filed on November 10, 2011 (**Exhibit D**, pg. 27).

The court further finds that note 12 which was included in NALIC's 2009 and 2010 original annual statements (**Exhibits A & B**) and in the September 30, 2011 quarterly statement (**Exhibit C**) fails to disclose accurately the underfunding of the defined pension plan, given that the actuarial valuation used was obsolete. The December 31, 2009 annual statement employed a valuation actuarial date of December 31, 2007 and the December 31, 2010 and the quarterly

statement ended September 30, 2011 used an actuarial valuation date of January 1, 2009. Note 12

regarding the defined benefit pension plan fails to comply with the disclosure requirements[7] and

---

[7] SSAP No. 89 provides the following regarding disclosures that shall be made for defined benefit pension plans:

**Disclosures**
"11. The following disclosures shall be made for defined benefit pension plans for which the reporting entity is directly liable (i.e., the plan resides directly in the reporting entity):

a. A reconciliation of beginning and ending balances of the projected benefit obligation showing separately, if applicable, the effects during the period attributable to service cost, interest cost, contributions by plan participants, actuarial gains and losses, foreign currency exchange rate changes, benefits paid, plan amendments, business combinations, divestitures, curtailments, settlements, and special termination benefits;

b. The amount of the accumulated benefit obligation for fully vested employees and partially vested employees only to the extent of their vested amounts.

c. The amount of the projected pension obligation and accumulated benefit obligation for non-vested employees as of the most recent actuarial valuation date;

d. A reconciliation of beginning and ending balances of the fair value of plan assets showing separately, if applicable, the effects during the period attributable to actual return on plan assets, foreign currency exchange rate changes, contributions by the reporting entity, contributions by plan participants, benefits paid, business combinations, divestitures, and settlements;

e. The funded status of the plan, the amounts not recognized in the statement of financial position, and the amounts recognized in the statement of financial position, including:

i. The amount of any unamortized prior service cost;

ii. The amount of any unrecognized net gain or loss (including asset gains and losses not yet reflected in market-related value);

iii. The amount of any remaining unamortized, unrecognized net obligation or net asset existing at the initial date of application of this statement;

iv. The net pension or other postretirement benefit prepaid assets or accrued liabilities; and

v. Any intangible asset;

f. Information about plan assets:

i. For each major category of plan assets, which shall include, but is not limited to, equity securities, debt securities, real estate, and all other assets, the percentage of the fair value of total plan assets held as of the measurement date used for each statement of financial position presented;

ii. A narrative description of investment policies and strategies, including target allocation percentages or range of percentages for each major category of plan assets presented on a weighted-average basis as of the measurement date(s) of the latest statement of financial position presented, if applicable, and other factors that are pertinent to an understanding of the policies or strategies such as investment goals, risk management practices, permitted and prohibited investments including the use of derivatives, diversification, and the relationship between plan assets and benefit obligations;

iii. A narrative description of the basis used to determine the overall expected long-term rate-of-return-on-assets assumption was based on historical returns, the extent to which adjustments were made to those historical returns in order to reflect expectations of future returns, and how those adjustments were determined;

recognition of liability in the financial statements pursuant to SSAP. No. 89, Accounting for

Pensions.[8] This conclusion is reached after comparing the extent of the information included in

iv. Disclosure of additional asset categories and additional information about specific assets within a category is encouraged if that information is expected to be useful in understanding the risks associated with each asset category and the overall expected long-term rate of return on assets.

g. The benefits (as of the date of the latest balance sheet presented) expected to be paid in each of the next five fiscal years, and in the aggregate for the five fiscal years thereafter. The expected benefits should be estimated based on the same assumptions used to measure the company's benefit obligation at the end of the year and should include benefits attributable to estimated future employee service;

h. The employer's best estimate, as soon as it can reasonably be determined, of contributions expected to be paid to the plan during the next fiscal year beginning after the date of the latest statement of financial position presented. Estimated contributions may be presented in the aggregate combining (1) contributions required by funding regulations or laws, (2) discretionary contributions and (3) noncash contributions.

i. The amount of net periodic benefit cost recognized, showing separately the service cost component, the interest cost component, the expected return on plan assets for the period, the amortization of the unrecognized incremental liability or incremental asset (see paragraph 18), the amount of recognized gains and losses, the amount of prior service cost recognized, and the amount of gain or loss recognized due to a settlement or curtailment;

j. The amount included in unassigned funds (surplus) for the period arising from a change in the additional minimum pension liability recognized pursuant to paragraph 5;

k. On a weighted-average basis, the following assumptions used in the accounting for the plan: assumed discount rate, rate of compensation increase (for pay-related plans), and expected long-term rate of return on plan assets specifying, in a tabular format, the assumptions used to determine the benefit obligation and the assumptions used to determine the net benefit cost;

l. The measurement date(s) used to determine pension measurements for the pension plans that make up at least the majority of plan assets and benefit obligations;

m. If applicable, the amounts and types of securities of the reporting entity and related parties included in plan assets, the approximate amount of future annual benefits of plan participants covered by insurance contracts issued by the reporting entity or related parties, and any significant transactions between the reporting entity or related parties and the plan during the period;

n. If applicable, any alternative method used to amortize prior service amounts or unrecognized net gains and losses pursuant to paragraphs 26 and 33 of FAS 87;

o. If applicable, any substantive commitment, such as past practice or a history of regular benefit increases, used as the basis for accounting for the benefit obligation;

p. If applicable, the cost of providing special or contractual termination benefits recognized during the period and a description of the nature of the event; and

q. An explanation of any significant change in the benefit obligation or plan assets not otherwise apparent in the other disclosures required by this statement.

Amounts related to the reporting entity's results of operations shall be disclosed for each period for which an income statement is presented. Amounts related to the reporting entity's statement of financial position shall be disclosed as of the measurement date used for each balance sheet presented." SSAP. No. 89.

[8] SSAP provides the following regarding recognition of a liability pertaining to a defined benefit pension plan:
**Defined Benefit Plans**
3. A defined benefit plan defines the amount of the pension benefit that will be provided to the plan participant at retirement or termination. For such benefit plans, reporting entities shall adopt *Financial Accounting Standards Board*

note 12 of the original 2009 and 2010 annual statements and the September 30, 2011 quarter statement versus the extent of the information included in note 12 of the amended 2009 and 2010 financial statements (**Exhibit 12**, pgs. 19.11-19.12, note 12 & **Exhibit 13**, pgs. 19.12-19.13, note 12).

Note 2 of both the amended 2009 and 2010 financial statements discloses that "[t]he Company determined it was necessary to restate its statutory financial statements for the year ended December 31, 2009 due to the following errors: … "the 2009 financial statements did not reflect the accounting for the Company's pension plan in accordance with SSAP No. 89-Accounting for Pensions" (**Exhibit D**, pg. 11, bullet 5; **Exhibit 12**, pg.19.4, note 2, **Exhibit 13**, pg. 19.4, note 2).

---

(FASB) *Statement No. 87* (FAS 87), *Employers' Accounting for Pensions* with modifications to exclude non-vested employees and to account for the additional minimum pension liability. Therefore, the cost related to services rendered prior to becoming eligible and vested in the plan are recognized as a component of the net periodic pension cost in the period the employee becomes vested. Any intangible asset or prepaid expense, other than the intangible asset associated with the transition obligation recorded as of January 1, 2001, resulting from adoption of the provisions of this statement shall be considered a nonadmitted asset, as such an asset cannot be readily converted to cash to satisfy policyholder obligations. This is consistent with the definition of assets and nonadmitted assets set forth in *SSAP No. 4—Assets and Nonadmitted Assets* (SSAP No. 4).

4. If the accumulated benefit obligation exceeds the fair value of plan assets, the reporting entity shall recognize a liability (including unfunded accrued pension cost) that is at least equal to the unfunded accumulated benefit obligation. Recognition of an additional minimum liability is required if an unfunded accumulated benefit obligation exists and (a) a prepaid pension cost asset has been recognized as a nonadmitted asset, (b) the liability already recognized as unfunded accrued pension cost is less than the unfunded accumulated benefit obligation, or (c) no accrued or prepaid pension cost has been recognized.

5. If an additional minimum liability is recognized an equal amount shall be recognized as an intangible asset, provided that the asset recognized shall not exceed the amount of unrecognized prior service cost (unrecognized prior service cost shall include unamortized incremental liability). If an intangible asset generated by the additional minimum liability is recognized, only that portion in excess of the unamortized incremental liability associated with the transition shall be nonadmitted. If an additional liability required to be recognized exceeds unrecognized prior service cost, the excess (which would represent a net loss not yet recognized as net periodic pension cost) shall be reported as a component of unassigned funds (surplus), net of any tax benefits that result from considering such losses as temporary differences for purposes of applying the provisions of *SSAP No. 101—Income Taxes, A Replacement of SSAP No. 10R and SSAP No. 10.*

6. When a new determination of the amount of additional liability is made, the related intangible asset and the balance accumulated in unassigned funds (surplus) shall be eliminated or adjusted as necessary." SSAP No. 89

NALIC included in its December 31, 2010 financial statements an additional minimum pension liability and pension cost in the amount of $4,251,769 as a reconciling line item in its liabilities section of the balance sheet between the reported 2010 annual statements and the reported statutory financial statements (**Exhibit D**, pg. 27).

Note 13, titled *Capital and Surplus, Shareholders' Dividend restrictions and Quasi Reorganization*, in the amended December 31, 2010 annual statement discloses the adjustments to the liabilities, including the additional minimum pension liability and pension cost in the amount of $4,251,764 (**Exhibit 13**, pgs. 19.14-19.15, note 13). After all of the adjustments were recorded and recognized in the liabilities section of the 2010 annual statement it ties with the total liabilities balance which is in the amount of $135,554,829 of the amended December 31, 2010 (**Exhibit 13**, pg. 3, line item 28).

The court finds that approximately two (2) months after the private agreement was executed, NALIC filed an amended December 31, 2010 annual statement recognizing an additional minimum pension liability and pension cost in the amount of $4,251,764 as an incurred liability, which had not been recognized and recorded as a liability in the balance sheet. This liability had been incurred and was not recognized by management and was not recorded as a liability in the balance sheet of NALIC's financial statements for the year ended December 31, 2010, meaning it had not impacted NALIC's balance sheet. Management did not comply with the directives of SSAP No. 89 by failing to properly and fully disclose the required information regarding the defined benefit plan and most important failing to recognize and record the liability in its financial statements. Moreover, the disclosure included in the notes to the original 2009 and 2010 financial statements regarding the defined benefit plan used an actuarial valuation data that was obsolete.

The court concludes that the liability (obligation) in the amount of $4,251,764 for an additional minimum pension liability was not recorded or reflected in NALIC's financial statements as of December 31, 2010 (**Exhibit B**). In addition, the quarterly September 30, 2011 financial statements did not reflect the liability incurred of $4,251,764 regarding the additional minimum pension liability since the restated 2009 and amended 2010 financial statements were completed after the September 30, 2011 quarterly statement had been filed (**Exhibits C**, **12 & 13**). This particular liability that was not reflected in the financial statements as of September 30, 2011 was detected on January 2012, well within the nine (9) period after the execution of the private agreement on November 10, 2011. The court further finds that management is responsible for a company's financial statements and is also responsible for conducting the transactions and affairs of a company in conformity with the established accounting standards, financial principles and applicable laws. The officers of a corporation are appointed by the Board of Directors and are responsible for overseeing management and the day to day operations of the corporation. The Board of Directors is responsible for overseeing all management functions and decisions, and for the financial statements and the accompanying notes to the financial statements.

As stated before in relation to not recording the settlement agreement, the reference in the fourth clause, "… to the extent that all or part of the sum has not been consumed, the balance, if any, of the aforementioned amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) shall be returned to NAPRO" refers to the balance of the obligations being consumed, not to the actual payment of the obligations which could be anytime in the future depending on the nature and terms of the obligation. As stated before, the parties themselves admit that the individuals involved in the negotiating and drafting of the private agreement are sophisticated parties, thus if these sophisticated parties would have wanted to include as an

additional condition not only to the consummation of the obligation balance but also the actual payment of said obligation they would have drafted the fourth clause accordingly.

### **Aggregate Reserves for Life and Annuities & Health Services Claims**

NAPRO argues that it proved that the financial statements included full disclosure of the pending contingency of health services claims, that the reserves established by NALIC were reasonable, and that any deviation from the Reserves was within the 5% to 12% accepted within the industry (Docket No. 195, pg. 32). NAPRO argues that Note 34 of the 2009 and 2010 annual statements (**Exhibit A**, pg. 19.6, note 34 and **Exhibit B**, pg. 19.6 note 34) and the quarterly statement as of September 30, 2011 (**Exhibit C**, pgs. 7.6, note 34) clearly disclosed that there were accident and health unpaid claims and that changes in the ultimate liabilities for insured events may be required as information develops. The Plaintiff also argues that the amended 2010 financial statements contain the exact same amounts for Reserves; Life and Health and Accident Reserves, as the original 2010 financial statements (**Exhibit B**, pg. 3, line items 1 & 2, Aggregate Reserve for Life Contracts; $88,534,834 and Reserves for accident and health; $12,339,568; **Exhibit 13**, pg. 3, line items 1& 2, $88,534,834 and Reserve for Accident and Health; $12,339,568). The reserves for accident and health contracts in the original 2009 and the amended annual statement reflect the same amounts (**Exhibit A**, pg. 3, line item 2, **Exhibit 12**, line item 2). The difference between the 2009 annual statement and the amended 2009 annual statement pertaining to the life reserves is about 5% (Docket No. 195, pgs. 13-14, 17-18).

Ancon argues that the increase in the Aggregate Reserves for Life in the amended 2009 in the amount of $4,414,538 represents a liability not reflected in the financial statements as of September 30, 2011 (**Exhibit A**, pg. 3, line item 1; **Exhibit 12**, pg. 3, line item 1). Ancon also argues that Multinational Life had to pay millions of dollars for obligations not reflected in the financial statements reviewed by Ancon prior to the Agreement. Those payments are related to a

contractual relationship between NALIC and a company called Option Health Care Network, Inc. ("Option"). NALIC included in its financial statements the amount reported by Option as outstanding debts to the providers, what is called ICOS ("claims in course of settlement").

Additionally, such outstanding amount was included as part of the Reserve of the Company in the Yearly Annual Statements of NALIC. During the period from November 10, 2011 to August 9, 2012 NALIC had received claims in the amount of $4,105,380 (See **Exhibit J**). Taking into consideration only a sample of twenty claims amounting to $1,315,272.332, Multinational Life had to settle and pay for those particular claims the amount of $662,573.95 during the nine-month period of time agreed in Clause Four of the Agreement (See **Exhibit I**). The amount reported by Option to NALIC as outstanding debt was also substantially less than the real amount owed to the health providers (Docket No. 195, pgs. 12-14).

The court notes that both parties agree that the Aggregate Reserves for Life contracts in the original 2009 statement were in the amount of $87,652,446 (**Exhibit A**, pg. 3, line item 1) and in the amended 2009 annual statement the life reserves were in the amount of $92,066,994, a difference of $4,414,548 (**Exhibit 12**, pg. 3, line item 1).

Note 2, titled "Restatement of Previously Issued Financial Statements and Correction of an Error," to the audited statutory basis financial statements as of December 31, 2010 and 2009 (restated), informs that the Company determined that it was necessary to restate its statutory financial statements for the year ended December 31, 2009 due to certain errors which were listed. Amongst the errors included in the 2009 financial statements was an adjustment that was required to *correct an error* in the aggregate reserves of life and annuity multi-term policies for Florida from 2006 to 2009 (**Exhibit D, pg. 11**). There were various adjustments to the December 31, 2009 financial statements as previously reported. One of the adjustments was an increase in the

amount of $4,414,538 in the Aggregate reserves- Life and annuity (**Exhibit D, pg. 12**). This adjustment was included in the amended 2009 annual statements (**Exhibit 12**, pg. 3, line item 1).

The court finds that the liability pertaining to aggregate reserves for life contracts was reflected in the financial statements. However, the required adjustment was to correct an error, not a liability that was not reflected in the financial statements.

Ancon argues that Multinational had to pay millions in claims between November 10, 2011 and August 9, 2012 for obligations not reflected in the financial statements reviewed by Ancon prior to the Agreement. Those payments are related to a contractual relationship between NALIC and Option. The court finds that irrespective of whether Multinational Life Insurance was legally bound to pay these claims, Ancon did not establish the legal basis to determine that the same constituted an obligation (liability) not reflected in the financial statements as of September 30, 2011. In particular, how these claims paid impacted the accident and health reserves in the financial statements when the amounts for this line item did not change when comparing the original 2009 and 2010 annual statements to the amended 2009 and 2010 annual statements. Moreover, there is no detail/breakdown/allocation of the accident and health reserves.

### Conclusion

In view of the foregoing, this court finds and concludes that:

1. The application of the <u>Bangor Punta</u> case to the instant adversary proceeding is inapposite due to the difference in the facts and in the applicable law.

2. The case of <u>Multinational Life Insurance Company v. Carlos Benitez Rivera; Edgardo Van Rhyn Soler, et als.</u>, is based upon different factual scenarios, causes of action, and therefore different legal foundations that do not bear any relevance in the instant adversary proceeding.

3. The argument that the fourth clause of the private agreement of sale of shares is not a

valid clause because of the doctrine established in <u>Bangor Punta Operations, Inc. v. Bangor & A.R. Co</u>., is unfounded.

4. Pursuant to the evidence presented and the analysis performed herein, there were obligations that were not reflected in the financial statements as of September 30, 2011, and that the same exceeded the $300,000 that were reserved to guarantee these obligations. In addition, the obligations that were not reflected in the financial statements became known to Ancon within the nine-month period after the execution of the private agreement. Such obligations include: (i) the legal settlement in the amount of $1,000,000 that was not reflected in the financial statements as of September 30, 2011; and (ii) the obligation in the amount of $4,251,764 for an additional minimum pension liability that was not recorded or reflected in NALIC's financial statements as of September 30, 2011. These obligations became known in January 2012, within the nine (9) period after the execution of the private agreement on November 10, 2011.

5. Management is responsible for a company's financial statements and is also responsible for conducting the transactions and affairs of a company in conformity with the established accounting standards, financial principles and applicable laws. The officers of a corporation are appointed by the Board of Directors and are responsible for overseeing management and the day to day operations of the corporation. The Board of Directors is responsible for overseeing all management functions and decisions and is responsible for the financial statements and the accompanying notes to the financial statements. It is the responsibility of the officers and directors of a company to abide by the statutory accounting principles and recognize and record liabilities that impact the financial statements to properly state the financial condition of a company.  The amended 2009 and 2010 financial statements and the notes which were prepared by NALIC's management show that obligations were not reflected in the financial statements and, thus, the financial statements had to be amended.

6. The reference in the fourth clause, "… to the extent that all or part of the sum has not been consumed, the balance, if any, of the aforementioned amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) shall be returned to NAPRO" refers to the balance of the obligations being consumed, not to the actual payment of the obligations which could be anytime in the future depending on the nature and terms of the obligation.

### Disposition

Consequently, the court denies plaintiff's request for the defendant to pay the retained amount of $300,000 and orders the dismissal of the complaint.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 2nd day of July 2020.

Enrique S. Lamoutte
United States Bankruptcy Judge

-81-